[No. B130661. Second Dist., Div. Three. Feb. 24, 2000.]

MIKE DAVIDOV COMPANY, Plaintiff and Respondent, v.
STEVEN ISSOD, Defendant and Appellant.

600

COUNSEL

Law Office of Brian P. Simon and Brian P. Simon for Defendant and Appellant.

Sherman, Nathanson & Miller, Richard Lloyd Sherman, Ken Nathanson and Craig J. Englander for Plaintiff and Respondent.

OPINION

**CROSKEY, J.**—The defendant Steven Issod, was sued by the Mike Davidov Company, which is owned by Mike Davidov (plaintiff), for fraud and breach of contract after defendant failed to return a diamond to plaintiff. Following a bench trial, the court ruled in favor of plaintiff, and awarded him $20,301 in compensatory damages on the fraud cause of action, and $96,000 in punitive damages. We conclude that the judgment is amply supported by the record, and that the award of punitive damages was proper even though plaintiff did not produce evidence of defendant's financial condition. As defendant failed to obey a court order requiring him to produce records of his financial condition, he is estopped to object to the absence of such evidence.

## Factual and Procedural Background[1]

On February 22, 1995, defendant telephoned plaintiff and asked plaintiff to send over two diamonds. Defendant represented to plaintiff that he had a customer present in his office at the time of the telephone call, and that this customer was interested in buying a diamond of a particular size and quality.

Both plaintiff and defendant are active members of the diamond industry. Plaintiff has been in the diamond business for 35 years and is the founder and past president of the Los Angeles Diamond Club West Coast (the Diamond Club). Business disputes between members of the Diamond Club are generally handled internally. It is unusual that members are required to bring civil actions against each other in connection with diamond transactions. However, plaintiff had once before been required to file a civil action against defendant in order to collect money due from an earlier diamond transaction. That transaction involved a situation in which a diamond was purchased and sent out of the country to be cut; defendant and two other men involved in the purchase personally guaranteed payment to plaintiff, and when the other two men did not pay, plaintiff was forced to file suit against defendant.

Understandably, plaintiff was reluctant to provide defendant with stones, and agreed to do so only because defendant represented that, at the time of his call, he had a customer in his office who was interested in a particular size and quality of diamond, and that the diamonds would remain in defendant's possession and would be returned to plaintiff within three hours, in other words, before the end of the day. Defendant agreed to these terms. The stones were handed over to defendant's messenger with a memorandum (No. 4406), a printed receipt from plaintiff which expressly set out the limited character of plaintiff's delivery.[2]

The memorandum showed that one of the stones, a 3.03-carat diamond, described as worth $20,301, had been received by defendant's business,

---

[1]The following facts are taken from the evidence presented at trial and viewed in the light most favorable to plaintiff as the prevailing party. The procedural facts are taken from the clerk's transcript and are not in dispute.

[2]The receipt stated, in relevant part: "The goods described and valued below are delivered to you in shop condition for EXAMINATION AND INSPECTION ONLY and are not on sale or return or constitute an offer to you to purchase. The goods remain our property subject to our order and shall be returned to us immediately after examination and inspection or on demand and until returned to us and actually received you will take all strict precautions as to the safety and security of the goods and bear all consequences for loss, theft[,] damage, or otherwise. You have NO RIGHT OR POWER TO SELL, PLEDGE HYPOTHECATE OR DEAL with the goods in any manner whatsoever. If you wish to purchase all or any of such goods our Invoice or Sale Note will be rendered after mutual agreement as to price and terms of sale thereof."

on February 22, 1995. Above the line for the signature showing that the goods had been received, was the statement "Received the above goods in good order on the terms and conditions set out (This is NOT an invoice or bill of sale)". The memorandum was signed by one of defendant's agents who picked up the stones.

Defendant's office was only two or three blocks away from plaintiff's office. At 5:00 p.m., plaintiff called defendant and asked "what's happening with [the] stones?" Defendant told plaintiff he would call him back later because he was busy with other lines, and said that his customer hadn't come yet. The next day, and thereafter, plaintiff tried calling defendant over and over, but defendant would never take his calls. Finally, plaintiff went to defendant's office and told him he wanted the stones back. Defendant told him he could return one of the stones, but the second stone, the 3.03-carat stone, was not in his office. Defendant also told plaintiff that he had sent both stones out of his office without plaintiff's permission, and had gotten only one of the stones back.

Plaintiff sued defendant for breach of contract, open book account, account stated and fraud. Soon thereafter, defendant filed for bankruptcy. The matter went to trial, with the first cause action for breach of contract stayed because of the bankruptcy proceedings.

At trial, plaintiff testified to the facts related above.[3] In contrast, defendant testified that he did not tell plaintiff that he had a customer waiting in his office to see the stones but that he had told plaintiff he needed to send the diamond in question out of town. He testified at trial that he did not tell plaintiff where, in particular, he was going to send the diamond; however, during his deposition he testified that he told plaintiff he was sending that stone to someone in New York. Defendant also denied that there was any discussion that he could have the stone for only a three-hour period; moreover, he insisted that he and plaintiff had agreed that defendant would pay for the stone only if the stone was sold. However, this trial testimony was impeached by a declaration from defendant which had been filed earlier in the lawsuit, in which defendant stated that on, February 22, 1995, his company had agreed to receive a diamond for inspection and examination and that 10 days later he and plaintiff entered into an oral agreement that defendant would pay for the diamond upon selling such diamond and receiving the funds for it, neither of which occurred.

---

[3]Plaintiff also presented evidence related to defendant's prior felony conviction; he argued that it was inferable that defendant had lied on his application to become a member of the Diamond Club, because the applications supposedly asked if the applicant had ever been convicted of a felony. However, the trial court specifically found this evidence unpersuasive on the issue of whether defendant had actually lied on an application to be a member of the Diamond Club.

Defendant testified that he tried to get the stone back for several months. However, he never wrote letters to the recipient in New York in an attempt to get the stone back, nor did he ever file a lawsuit in New York to get the stone back. Nor did defendant go to the Diamond Club in New York to ask for the club members' assistance in obtaining the stone because, according to defendant, the recipient of the stone was not a member of the club so that would not have done any good. At trial, defendant offered into evidence a memorandum on his own letterhead, dated February 22, 1995, which purported to show that he had sent the diamond in question to Steve Eagel, Inc., in New York. However, defendant had failed to produce this document during discovery, and he was badly impeached as to its authenticity during cross-examination. The trial took place on January 13, 1997. After both sides made their closing arguments, the trial court found in favor of plaintiff and against defendant on the fourth cause action, for fraud, in the amount of $20, 301, plus interest, as compensatory damages.

The trial court then asked what evidence plaintiff had as to defendant's financial condition or net worth. Plaintiff's counsel replied that he had no evidence, other than defendant's representations that he was judgment-proof. The trial court asked whether it did not need evidence of net worth in order to award punitive damages against defendant. In reply, plaintiff asked for a hearing and the opportunity to conduct discovery on the issue of defendant's financial condition.

The trial court granted that request and ordered defendant to produce all records regarding his net worth by 9:00 a.m. the next day and to turn over all such records to plaintiff's counsel. Plaintiff's counsel then asked if he would have an opportunity to examine defendant at that hearing to establish his net worth, and the trial court agreed that he would. According to the minute order, the trial court bifurcated the issue of punitive damages, and set a hearing for the next day. Notably, defense counsel initially did not object to these requests or orders at the time, and merely expressed the concern that they would be going over the five-hour trial time estimate if they went into the punitive damage issue the next day. However, almost as an afterthought, *defense counsel did object to the requirement that defendant be required to bring in his financial records, on the ground that they had not been requested during discovery, nor subpoenaed for trial.* Plaintiff's counsel then argued that, until liability for punitive damages had been established, he had been precluded from conducting discovery of the defendant's financial situation; defense counsel argued that, nonetheless, plaintiff should have subpoenaed the records or made a motion to bifurcate. The trial court did not withdraw its order that defendant bring in his financial records, thus implicitly overruling defendant's objections. (See, e.g., *People v. Hayes* (1990) 52 Cal.3d

577, 619 [276 Cal.Rptr. 874, 802 P.2d 376]; *People* v. *Jacobs* (1987) 195 Cal.App.3d 1636, 1650-1651 [241 Cal.Rptr. 550].)

The next day, defendant did not bring in his financial records. Plaintiff argued that, pursuant to *Weisenburg v. Molina* (1976) 58 Cal.App.3d 478 [129 Cal.Rptr. 813], the trial court could award punitive damages without evidence of defendant's net worth, using a multiplier of the compensatory damages to come up with an appropriate amount. Defendant argued that evidence of net worth was required. The trial court agreed with plaintiff and heard argument on the issue of punitive damages. The court then awarded punitive damages to plaintiff in the sum of $96,000. This was a little over four times the compensatory damages which had already been awarded.[4]

Judgment was entered on February 14, 1997, and defendant thereafter filed this timely appeal.

---

[4]In announcing its decision, the trial court stated:

"All right. The evidence is not clear as to whether or not [defendant] lied his way into The Diamond Club. There is no application in evidence as to his representations. There is a feeling that has been expressed by the Plaintiff that had his prior record, had a felony conviction been known, he would not have been allowed in. But that's all we have. It doesn't arise to level of proof of that particular representation.

"However, the evidence in this case is very egregious. The Diamond Club membership, notwithstanding the evidence here, it is that there is a tremendous amount of reliance on the integrity of individuals in the business. And [defendant] was aware of that, given his history in the business, and he intentionally breached it. [¶] The diamond was received for purposes other than those represented by him. He evaded any contact with [plaintiff] to ascertain the whereabouts of this, until he was confronted in a manner in which he could not really evade it any longer, and then began to respond in ways to further perpetrate the deceit. That continued up through his treatment of this trial, specifically the evidence presented by the Defendant by way of Exhibit C [the memorandum on defendant's letterhead purporting to show the stone had been sent to Steve Eagel, Inc. in New York], is found by the Court, as I indicated yesterday, to be suspect, fabricated for the purpose of this trial, and possibly for the purpose of attempting to assuage the concerns of the Plaintiff. The statement by [defendant] that he wasn't sure which of two entities he had sent the diamond to is nothing short of preposterous, given the value of the diamond, circumstances under which the transaction purportedly took place, his expected concern of his reputation with [plaintiff], given that this was the culmination, apparently, of a continuing pattern of problematic dealings that the Plaintiff had with [defendant], giving him stones that weren't returned in a timely fashion until pressed to the point.

"Regardless of the Defendant's financial condition, and the court assumes it's not in the best of situations, given the bankruptcy proceeding as to The Ring Company [the name under which defendant did business], the Defendant is back in business under another entity, as demonstrated by Exhibit C. [¶] However, the total circumstances of the evidence in this case evidencing the—cavalier really isn't the best word here, it goes stronger than that, flies in the face of an entire industry in which this Defendant continues to operate, is of a value of punitive damages that the Court finds to be approximately four times the amount of the actual damages. [¶] Punitive damages are awarded in the sum of $96,000."

CONTENTIONS ON APPEAL

Defendant contends that (1) there was insufficient evidence to support the trial court's finding of fraud; and, even if present, it was not sufficiently clear and convincing to justify an award of punitive damages; (2) it was improper for plaintiff to argue that defendant had lied in his application to be a member of the Diamond Club; and (3) the trial court erred by awarding punitive damages without any evidence on which to base a finding as to defendant's financial condition. While we deal with the first two contentions it is the third one which is the most significant and it is that one upon which we focus the most attention.

DISCUSSION

1. *There Was More Than Sufficient Evidence to Support the Trial Court's Findings and the Judgment*

█ The testimony credited by the trial court was that of plaintiff. He testified that defendant called him and told him that defendant had a buyer for a particular size and grade of diamond in defendant's office at that moment. Plaintiff further testified that he and defendant agreed that plaintiff would send over two stones from which the potential buyer could choose, and that defendant would return any stones which were not sold within three hours. Defendant, on the other hand, said that he and plaintiff had agreed that defendant could send one stone to a potential buyer in New York for consideration by a potential buyer, and thereafter the potential buyer refused to either return the stone or to pay for it.

Defendant's version of what occurred was clearly less credible than that of plaintiff. Notably, defendant did not deny that he had received the two stones from plaintiff. However, his testimony about the circumstances under which he received the stones, and then parted with one of them, was evasive at best. For example, defendant could not initially recall to whom he had sent the diamond. Furthermore, defendant never produced any credible evidence that he had actually shipped the stone to New York, or that it had been received by anyone there. The trial court's conclusion that defendant had misrepresented his intentions to plaintiff in order to obtain possession of a valuable diamond which he did not intend to return in three hours, or at all, is clearly supported by substantial evidence.

Moreover, the trial court necessarily found that such fraud had been proven by clear and convincing evidence. That conclusion is established by the fact of the award of punitive damages and the trial court's own description of its reasoning. (See fn. 4, *ante.*) █ While an appellate court may

require a more aggressive scrutiny of the evidence in a case such as this where a finding of fraud is required to be based upon clear and convincing evidence (see *Hoch v. Allied-Signal Inc.* (1994) 24 Cal.App.4th 48, 60-61 [29 Cal.Rptr.2d 615]; *Stewart v. Truck Ins. Exchange* (1993) 17 Cal.App.4th 468, 482 [21 Cal.Rptr.2d 338]), it is only necessary that we find that there was substantial evidence to support a determination by that higher standard. (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269-1287 [31 Cal.Rptr.2d 433].) That requirement is certainly satisfied in this case. If the trial court concludes that the clear and convincing standard has been met, and there is substantial evidence to support it, then we must affirm. (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750 [106 Cal.Rptr. 187, 505 P.2d 1027].)

### 2. Defendant Was Not Prejudiced by Any Reference to His Application to Be a Member of the Diamond Club

Defendant contends that plaintiff improperly presented untrue and prejudicial evidence related to his earlier criminal conviction. He further contends that for this reason, "the finding of egregious conduct by [defendant] should be reversed."

As noted above, the trial court specifically stated that the evidence did not prove that defendant had misrepresented himself as having no felony conviction in order to obtain membership in The Diamond Club. ■ A reversible error only exists when it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of that error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) ■ Where there has been a trial by the court without a jury it is ordinarily presumed that the court based its findings only upon admissible evidence. (*Fascination, Inc. v. Hoover* (1952) 39 Cal.2d 260, 268 [246 P.2d 656].) Here, the trial court specifically stated that plaintiff had failed to prove that defendant lied in his application. It is clear that the trial court came to its conclusions based on the evidence related to the particular transaction in question and to defendant's representations to plaintiff , and not on defendant's criminal history nor his alleged misrepresentations to The Diamond Club.

### 3. The Trial Court Did Not Err by Awarding $96,000 in Punitive Damages

■ Defendant's principal contention, however, is that because plaintiff presented no evidence about defendant's financial condition, the award of punitive damages is contrary to California law.

■ The general rule on this issue is set forth in *Adams v. Murakami* (1991) 54 Cal.3d 105 [284 Cal.Rptr. 318, 813 P.2d 1348]. In that case, the

California Supreme Court held that "A reviewing court cannot make a fully informed determination of whether an award of punitive damages is excessive unless the record contains evidence of the defendant's financial condition." (*Id.* at p. 110.) A punitive damages award is excessive if it is disproportionate to the defendant's ability to pay. (*Id.* at p. 112.) "[T]he most important question is whether the amount of the punitive damages award will have deterrent effect—without being excessive. Even if an award is entirely reasonable in light of [the nature of the misconduct and the amount of compensatory damages], the award can be so disproportionate to the defendant's ability to pay that the award is excessive for that reason alone." (*Id.* at p. 111, italics omitted.)[5] Thus, an award of punitive damages may be excessive when, for example, such award exceeded one-third of the defendant's net worth. (*Adams, supra,* at p. 112.) The purpose for requiring some evidence of a defendant's financial condition is to allow a reviewing court to reach a reasonably *informed* decision, rather than having to speculate as to whether the award is appropriate or excessive. (*Ibid.*)

What evidence of a defendant's financial condition *is* sufficient to allow proper review of an award of such damages? After *Murakami,* various courts have concluded that evidence of the defendant's annual income, *standing alone,* is not "meaningful evidence." (See, e.g., *Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064 [16 Cal.Rptr.2d 811].) However, at least one court has held that evidence of the profits wrongfully gained by the defendant is, in itself, adequate evidence upon which to base an award of punitive damages. (*Cummings Medical Corp. v. Occupational Medical Corp.* (1992) 10 Cal.App.4th 1291, 1298-1301 [13 Cal.Rptr.2d 585] (*Cummings*); but see *Robert L. Cloud & Associates., Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1152 [82 Cal.Rptr.2d 143] and *Kenly v. Ukegawa* (1993) 16 Cal.App.4th 49, 56-57 [19 Cal.Rptr.2d 771] [disagreeing with *Cummings* because the

---

[5]Thus, it is clear that *Weisenburg v. Molina, supra,* 58 Cal.App.3d 478, the case cited by plaintiff at trial, is simply no longer good law to the extent that it suggests no evidence of financial condition is ever necessary for an award of punitive damages.

In *Weisenburg,* which involved abuse of process to defraud a judgment creditor, the Court of Appeal affirmed an award of punitive damages against two defendants in the amounts of, respectively, $25,000 and $3,240.18. The jury had awarded only $625.40 in compensatory damages against both defendants. (*Weisenburg, supra,* 58 Cal.App.3d at pp. 482, 490-491.) The issue was whether the relationship between the punitive and compensatory damages was disproportionate, not whether the award of punitive damages could be proper without any evidence of the defendants' net worth. Although the reviewing court in that case noted, as part of a general discussion of the law, that "[t]he defendant's wealth is also a factor in determining the amount of an award of punitive damages, and evidence thereof is admissible *although not a prerequisite to such an award*" (*id.* at p. 490, italics added), in the case before it there *was* evidence, albeit conflicting, of the defendants' net worth. Thus, the *Weisenburg* court's comment that evidence of the defendant's wealth was not a prerequisite to an award of punitive damages was, even before *Murakami,* mere dictum, and after *Murakami* it is simply an erroneous statement of the law.

evidence of the illegally obtained profits gives only the defendant's assets without its liabilities; what is required is evidence of the defendant's ability to pay the damage award].)[6]

 Here, however, defendant was ordered to produce his financial records so that the trial court could make an evaluation of whether any particular punitive damage award would have the required deterrent effect without being overly burdensome. This order was never rescinded, nor has defendant argued on appeal that it was improper. Therefore, by failing to bring in any records which would reflect his financial condition, despite being ordered to do so, and by failing to challenge that ruling on appeal,

---

[6]In *Cummings, supra,* 10 Cal.App.4th 1291, a decision by Justice Johnson of Division Seven of this district, as in the case here, there was no evidence of the defendant's net worth. The court nevertheless found the evidence sufficient to support an award of $598,300 in punitive damages because the plaintiff established that the defendant's tortious conduct earned the defendant a profit of over $1 million. This profit, said the court, is "objectively based and uniquely appropriate as the basis for punitive damages. . . . Removing the gain in such a case, in addition to requiring the [the defendant] to compensate the plaintiff for its actual losses, makes it less likely the defendant will repeat the conduct. A gain-based measure of this sort sends a clear signal to defendants that such misconduct does not pay and, thus, serves the deterrent function of punitive damages." (*Id.* at pp. 1299-1300.)

Justice Johnson then went on to point out that "even if taking away the defendant's ill-gotten gains may sometimes not be enough to deter similar conduct, *it is never too much.* [¶] . . . In our view, it is proper and fitting to 'punish' a defendant by stripping the defendant of wealth gained through defrauding the plaintiff. A punitive damages award specifically tailored to this objective can never be 'excessive.' " (*Cummings, supra,* 10 Cal.App.4th at p. 1300, italics added, fn. omitted.) The court then went on to note that it did not mean to imply punitive damages resulting from fraudulent conduct need to be limited to the profit defendant obtained through its misconduct, but that it merely held that punitive damages calculated on the basis of the profitability of the defendant's fraudulent conduct satisfy the requirement that the trier of fact consider the financial condition of the particular defendant. (*Id.* at p. 1300, fn. 8.)

Specifically, the evidence in *Cummings* showed that because of Cummings's misrepresentations to the cross-complainant which Cummings made in connection with selling his business to the cross-complainant, Cummings made an unwarranted $354,300. (*Cummings, supra,* 10 Cal.App.4th at p. 1295.) In addition, because Cummings wrongfully violated a covenant not to compete with the cross-complainant, he made a profit of $248,820 per year, which continued for a period of five years for a total profit of $1,244,100. (*Ibid.*) The trial court awarded cross-complainant $4,367,717, which included $1 million in punitive damages. On appeal, the reviewing court concluded that because $1 million of the profit Cummings had made was recovered by the cross-complainant through compensatory damages, the punitive damage award had to be reduced to $593,300, which represented the remaining illegal profit obtained by Cummings. (*Id.* at pp. 1300-1301.)

We agree with the holding in *Cummings.* Nonetheless, if we were to apply it here, because the only evidence of defendant's financial condition was the profitability of his fraudulent conduct (in other words, that he obtained a diamond worth $20,301 [apparently on a wholesale basis]), the punitive damage award would have to be reduced to $20,301, which represents the illegal profits obtained by defendant by his fraud. However, because this sum was already awarded as compensatory damages it could not, under *Cummings,* be awarded twice, once as compensatory damages and once as punitive damages.

defendant has waived any right to complain of the lack of such evidence. (*Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1503, fn. 1 [65 Cal.Rptr.2d 266].)

We reject defendant's argument that plaintiff's failure (1) to conduct pretrial discovery of defendant's financial records, (2) to subpoena documents or witnesses to be available at trial for the purpose of establishing defendant's financial condition, and (3) to formally move to bifurcate the issues of liability and award (see Civ. Code, § 3295), preclude plaintiff from obtaining a court order requiring defendant to produce his financial records at trial. We see no problem with a trial court, in it discretion, ordering a defendant to produce evidence of his or her financial condition *following* a determination of the defendant's liability for punitive damages, even though the plaintiff had not previously done any of those three things.

■ Civil Code section 3295, subdivision (c), allows the trial court, "*at any time,*" to enter an order permitting the discovery of a defendant's profits and/or financial condition, if the plaintiff has established that there is a substantial probability that he or she can prevail on a claim upon which an award of punitive damages can be based. While it is true that subdivision (c) states that such an order may be made "[u]pon motion by the plaintiff supported by appropriate affidavits and after a hearing," that subdivision clearly presupposes that such motion procedure is required *where the plaintiff has not actually prevailed on his or her claim at trial.* However, once there has been a determination of liability by the trier of fact based on an actual weighing of the credibility of witnesses, this kind of affidavit-and-hearing procedure is patently superfluous. So long as the trial court allows the defendant sufficient time, following a determination of liability, to collect his or her financial records for presentation on the issue of the amount of such damages to be awarded, there is nothing prejudicial or unfair about using such a process to try the issue of the amount of punitive damages. If anything, this method serves the purpose behind section 3295, to wit, to protect against premature disclosure of the defendant's financial condition. (See, e.g., *Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 777-778 [63 Cal.Rptr.2d 859, 937 P.2d 290].)

■ In this case, defendant's records were the only source of information regarding his financial condition available to plaintiff. By his disobedience of a proper court order, defendant improperly deprived plaintiff of the opportunity to meet his burden of proof on the issue. Defendant may not now be heard to complain about the absence of such evidence. As defendant has not called our attention to anything in the record which otherwise reflects that the punitive damage award is excessive, we will affirm the award.

Although the trial court was incorrect when it concluded that, as a matter of law, punitive damages can be awarded without any evidence of a defendant's wealth, affirmance is nevertheless proper because there was a valid basis upon which such an award was proper, that is, defendant's failure to obey a court order to produce his financial records. ▋ If the decision of a lower court is correct on any theory of law applicable to the case, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the lower court reached its conclusion. (*Lucas v. Pollock* (1992) 7 Cal.App.4th 668, 673 [8 Cal.Rptr.2d 918].)

The rationale for this principle is twofold: (a) an appellate court reviews the action of the lower court and not the reasons given for its action; and (b) there can be no prejudicial error from erroneous logic or reasoning if the decision itself is correct. "The fact that the action of the court may have been based upon an erroneous theory of the case, or upon an improper or unsound course of reasoning, cannot determine the question of its propriety. No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117]; see also *Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481 [35 Cal.Rptr.2d 698] ["the appellate court should affirm the judgment of the trial court if it is correct on any theory of law applicable to the case, including but not limited to the theory adopted by the trial court"].) Because in this case there was a sound legal basis for the award of punitive damages, we affirm the judgment which includes such an award, despite the trial court's reliance on its erroneous understanding of the law related to punitive damages.

DISPOSITION

The judgment is affirmed. Plaintiff is awarded its costs on appeal.

Klein, P. J., and Schneider, J.,* concurred.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.