See Concurring Opinion

Filed 7/22/25  Winjet Trading v. Chu CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| WINJET TRADING, INC. et al., | |
| Plaintiffs and Respondents, | E081214 |
| v. | (Super.Ct.No. RIC1905805) |
| TSUI CHEN CHU, Individually and as Trustee, etc., et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Irma Poole Asberry, Judge.  Affirmed as modified.

Straggas Law Group and George D. Straggas; Grammatico Law Firm and Paul A. Grammatico, for Defendants and Appellants.

Kowal Law Group and Timothy M. Kowal for Plaintiffs and Respondents.

Plaintiffs and respondents prevailed in trial court in this fraudulent conveyance action.  On appeal, defendants and appellants make four arguments:  (1) there was no basis for damages liability under the Uniform Voidable Transactions Act (Civ. Code,

§ 3439 et seq.; UVTA) or common law; (2) awarding damages allows for double recovery; (3) if awardable, the damages award should be reduced; and (4) the trial court erroneously rejected their resulting trust defense.

We find the second argument has merit. Because the trial court set aside both transfers at issue, its damages award relating to the later transfer was an impermissible double recovery. We accordingly modify the judgment to strike the UVTA damages award. We find no merit in (or decline to consider as moot) appellants' other arguments and affirm the judgment as modified.[1]

## I. BACKGROUND

We begin with what we will call the Underlying Lawsuit. Plaintiffs and respondents Winjet Trading, Inc. and America Plastic Trading, Inc. (which we will refer to collectively as Winjet) are in the business of purchasing scrap materials and exporting them to Asia for processing and recycling. In 2017, they filed a complaint in Los Angeles County Superior Court against Jim Hsieh and several others. They alleged that, from 2011 to 2017 and while employed at Winjet, Jim Hsieh and others operated sham companies that bought scrap materials from true suppliers and resold them to Winjet at inflated prices. In 2019, the trial court awarded Winjet approximately $3.5 million.

During the Underlying Lawsuit, Winjet learned that, in 2014, Jim Hsieh had transferred his partial ownership in three houses in Corona from himself to his mother,

---

[1] Undesignated statutory references are to the Civil Code.

2

Tsui Chen Chu (the Corona Transfers). Seeking in part to avoid the transfers, Winjet filed the instant action in 2019, soon after judgment had been entered in the Underlying Lawsuit. The original complaint named Jim Hsieh and Tsui Chen Chu as defendants.

In 2020, after having been served with the complaint, Tsui Chen Chu executed a $400,000 cash out refinance loan (the Cash Out Loan) using one of the Corona houses—specifically, a house that Hsieh had transferred a 30 percent interest in (the Gypsum Creek Property). She then deposited the funds in a bank account co-owned by her, her husband Wu Yuan Hsieh, and their daughter (and Jim Hsieh's sister) Helen Hsieh. The operative complaint, filed in 2021, additionally names Wu Yuan Hsieh and Helen Hsieh as defendants (we will refer to the three defendants collectively as the Hsiehs). Jim Hsieh defaulted and is accordingly not a party to this appeal.[2]

Following a bench trial, the trial court issued a statement of decision in Winjet's favor in 2023. As relevant here, it found that the Corona Transfers were avoidable under the UVTA. It also found that the Cash Out Loan was avoidable under the UVTA. It rejected the Hsiehs' defense that Jim Hsieh was never a true owner of the Corona houses and was merely holding title in trust for his mother's benefit. The judgment avoided the Corona Transfers, reverted title on the three houses to what they were immediately prior

---

[2] The original and operative complaints also name three other individual defendants, two of whom were also defendants in the Underlying Lawsuit. All three defaulted, and the allegations relating to them do not affect the issues raised here.

to the Corona Transfers, and awarded Winjet $400,000 in damages (plus approximately $120,000 in interest) in connection with the Cash Out Loan.[3]

## II. DISCUSSION

The Hsiehs raise four arguments. First, as to the Cash Out Loan damages award, they contend there was no basis for awarding damages under the UVTA or common law. Second, they argue the damages award would allow Winjet a double recovery. Third, they argue that if damages are awardable, the award should be reduced to reflect the fact that Jim Hsieh only had a partial ownership interest. And fourth, as to the Corona Transfers, they argue the trial court's finding that Jim Hsieh was not holding title in trust lacked substantial evidence.

### A. *The Uniform Voidable Transactions Act*

Under the UVTA, a "transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation" with intent to defraud the creditor or if the debtor was insolvent and received no reasonably equivalent value in exchange. (§ 3439.04, subd. (a).) Transferring with intent to defraud is sometimes known as actual fraud, and receiving no reasonably equivalent

---

[3] The judgment also stated that Winjet held "a valid judgment lien" to the Corona houses "which is senior to any other lien or encumbrance arising on or after" October 3, 2019, which the judgment stated was the date the abstract of judgment from the Underlying Lawsuit was recorded.

4

value while insolvent is sometimes known as constructive fraud.  (See *Chen v. Berenjian* (2019) 33 Cal.App.5th 811, 817.)

When a transfer is found to be actually or constructively fraudulent, one remedy the creditor might obtain is "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim."  (§ 3439.07, subd. (a).)[4]  Another possible remedy is "judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less."  (§ 3439.08, subd. (b)(1).)  As to this second remedy, "[t]he judgment may be entered against" multiple people.  (§ 3439.08, subd. (b)(1).)  It may, for instance, be entered against the "first transferee of the asset or the person for whose benefit the transfer was made."  (§ 3439.08, subd. (b)(1)(A).)  It may also be entered against an "immediate or mediate transferee" of the first transferee so long as the immediate or mediate transferee is not a "good faith transferee that took for value" or an immediate or mediate transferee of a good faith transferee.  (§ 3439.08, subd. (b)(1)(B).)

The UVTA remedies are "cumulative and not the exclusive remedy for fraudulent conveyances."  (*Berger v. Varum* (2019) 35 Cal.App.5th 1013, 1019.)

---

[4]  As the official comments to the model law California's UVTA was based on states, "'[a]voidance' is a term of art in this [a]ct, for it does not mean that the transfer or obligation is simply rendered void.  It has long been established that a transfer avoided by a creditor under this [a]ct or its predecessors is nevertheless valid as between the debtor and the transferee."  Official Comments, Uniform Voidable Transactions Act (as amended in 2014), Section 7, Remedies of Creditor, ¶ 7, p. 35, available at <https://www.uniformlaws.org/viewdocument/final-act-156?CommunityKey=64ee1ccc-a3ae-4a5e-a18f-a5ba8206bf49&tab=librarydocuments> (last accessed Mar. 17, 2025).

*B. Liability for Cash Out Loan Damages*

The Hsiehs' first argument is that there is no basis for finding them liable on the Cash Out Loan under the UVTA or the common law. We begin with UVTA liability and some definitions.

Some, but not all, of the pertinent terms are statutorily defined. Under the UVTA, a "claim" refers to "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." (§ 3439.01, subd. (b).) A "creditor" is "a person that has a claim." (§ 3439.01, subd. (c).) A "debtor" is "a person that is liable on a claim." (§ 3439.01, subd. (e).) The UVTA does not specifically define "transferee," but the term generally refers to "[o]ne to whom a property interest is conveyed." (Black's Law Dictionary (12th ed. 2024).)

When Winjet filed the current lawsuit, it asserted a right to payment from Tsui Chen Chu based on Jim Hsieh's Corona Transfers. Although Tsui Chen Chu disputed the right to payment, Winjet was nevertheless a "creditor" that had a "claim" against Tsui Chen Chu, making her a "debtor." After being served with the complaint, Tsui Chen Chu took out the Cash Out Loan and deposited the proceeds into a bank account owned by her, Wu Yuan Hsieh, and Helen Hsieh. Accordingly, each of the Hsiehs were "transferees" of the Cash Out Loan proceeds. The trial court found that Tsui Chen Chu engaged in actual "and/or" constructive fraud under the UVTA with the Cash Out Loan.

6

The Hsiehs' challenge to the trial court's finding of UVTA liability is twofold. First, they claim they cannot be liable because Jim Hsieh was the "debtor," not Tsui Chen Chu. Second, they claim Wu Yuan Hsieh and Helen Hsieh are not "first transferees" of the Corona property securing the Cash Out Loan.

The flaw with both arguments is that they describe the Corona Transfers, not the Cash Out Loan. The trial court found *both* to be fraudulent. No one disputes that Jim Hsieh was the "debtor" on the Corona Transfers or that Wu Yuan Hsieh and Helen Hsieh received no interests in the Corona properties from that transfer. But neither of those details shows that the trial court erred in finding the Hsiehs liable under the UVTA for the Cash Out Loan. The Hsiehs therefore fail to show that the Cash Out Loan fell outside of the UVTA.

The Hsiehs also argue they cannot be found liable under common law. We need not decide the argument on the merits. The Hsiehs acknowledge the trial court did not rely on any common law theory of liability. They raise common law error in their opening brief as a preemptive attempt to challenge an alternative ground for affirming the damages award. The idea is that, even if we might conclude that there is no liability under the UVTA, the judgment might still be affirmed on a different theory. (See, e.g., *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 610.) However, because the Hsiehs have demonstrated no error under a UVTA theory, it does not matter whether the trial court might have erred under an alternative theory.

7

*C. Double Recovery*

The Hsiehs next argue that awarding damages on the Cash Out Loan gives Winjet an impermissible double recovery, as setting aside the Corona Transfers already gives Winjet a full recovery. We agree.

"A well-established principle, applied both at law and in equity, is that a plaintiff is entitled to only a single recovery for a distinct harm suffered, and double or duplicative recovery for the same harm is prohibited." (*Renda v. Nevarez* (2014) 223 Cal.App.4th 1231, 1237.) In avoidable or fraudulent transfer actions such as this one, that means that a "'defrauded creditor is not entitled to an enhancement of position beyond what it was before the fraud.'" (*Id.* at p. 1238.) Because the purpose is to prevent a plaintiff's unjust enrichment, the rule against double recovery can also be viewed as the single satisfaction rule. (See *Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 516-517 ["'To prevent a double recovery, equity demands credit be given for payments received on the judgment. . . . The single satisfaction rule is equitable in nature, and its apparent purpose is to prevent unjust enrichment."].)

Here, the judgment places Jim Hsieh again as partial owner of the three Corona properties, with the same percentage ownerships he had prior to the Corona Transfers. Winjet thus has, on the facts in our record, the same ability to recover from Jim Hsieh on its judgment in the Underlying Lawsuit as if the Corona Transfers never taken place. Accordingly, Winjet is returned to its pre-fraudulent transfer position, and the additional remedy of the Cash Out Award would "enhance[] [its] position beyond what it was

8

before the fraud" (*Renda v. Nevarez, supra*, 223 Cal.App.4th at p. 1238).  (See also *ibid.* ["because Renda obtained a judgment in the prior action for the damages Nevarez caused him, the principle against double recovery for the same harm bars him from obtaining a second judgment against her under the [UVTA's predecessor statute] for a portion of those same damages"].)

Winjet does not dispute the rule against double recovery.  However, it argues that there is no double recovery limitation here for three reasons:  (1) the only reasonable interpretation of the trial court's judgment already limits Winjet's recovery to what it was awarded in the Underlying Lawsuit; (2) only Jim Hsieh can raise a double recovery argument; and (3) Winjet has not been made whole because it has not received any interests in the Corona properties.  None has merit.

First, our focus here is whether Winjet is placed on equal footing as it was before the Corona Transfers, not whether it ultimately recovers more than $3.5 million (even though such a recovery would also violate the rule against double recovery).  Moreover, it is not the case that the only reasonable reading of the judgment caps Winjet's recovery to the approximately $3.5 million it was awarded in the Underlying Lawsuit.  The judgment does not expressly state that the Cash Out Loan damages award is to be credited against Winjet's $3.5 million award, even as it provides for certain previously attached funds to be credited against the Cash Out Loan damages award.

Second, the rule against double recovery is to prevent a plaintiff's windfall, so we see no reason to have its applicability depend on the specific defendant raising it.  (See

9

*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158 ["Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence"].) Notably, Winjet cites no authorities in arguing otherwise, so we deem its argument here forfeited. (See *Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 948 ["the failure to provide legal authorities to support arguments forfeits contentions of error"].) In any event, the persons affected by the double recovery would be the Hsiehs, who are making the argument. Winjet now may recover the value of Jim Hsieh's full 30 percent interest in the Gypsum Creek Property, with that interest transferred back to him. The additional $400,000 awarded came from the Hsiehs. Jim Hsieh, in fact, would benefit from maintaining that extra recovery as the amount would presumably be credited toward the $3.5 million that Jim Hsieh owes on the Underlying Lawsuit.

Third, Winjet argues there was no double recovery because there has been no transfer of property interests to make Winjet whole. However, like the first argument, this one also overlooks the relevant question, which is whether the plaintiff has been placed in the same position as prior to the fraudulent or avoidable transfer. (See, e.g., *Mejia v. Reed* (2003) 31 Cal.4th 657, 664 [predecessor statute to UVTA "'declares rights and provides remedies for unsecured creditors against transfers that impede them in the *collection* of their claims'"], italics added.) It thus does not matter for our purposes the extent to which Winjet has already recovered its $3.5 million judgment, such as through transfers of property interests to it.

Because Winjet has already been placed in its pre-fraudulent transfer position with the avoidance of the Corona Transfers, Winjet may not also recover damages for the Cash Out Loan. We will therefore modify the judgment to strike such award.

## D. Reduction of Damages Based on Jim Hsieh's Partial Interest

The Hsiehs next argue that, if damages could be awarded, the amount should be based on the value of Jim Hsieh's transferred interest in the Gypsum Creek Property and not based on the Cash Out Loan. Because we will strike the entirety of the Cash Out Loan damages award as an impermissible double recovery, we need not address whether there exists some separate justification for a partial reduction.

## E. Resulting Trust Defense

The Hsiehs' final argument pertains to the Corona Transfers. They argue Jim Hsieh merely held his partial interests in the three Corona properties in trust for Tsui Chen Chu's benefit. Thus, there was no "transfer" of property interests under the UVTA for the Corona Transfers, as Jim Hsieh never had beneficial ownership of those interests to begin with. The trial court rejected this theory and found that no trust was created by the purchase of the Corona properties.

The parties do not dispute that all three Corona properties were originally purchased solely with Tsui Chen Chu's money. The "general rule" is that "'[w]here a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid.'" (*Majewsky v. Empire Constr. Co., Ltd.* (1970) 2 Cal.3d 478, 485, citing Rest.2d Trusts,

11

§ 440.)  "There are, however, exceptions, to this doctrine.  It is well settled that one exception to the rule is found in transactions between parent and child." (*Quinn v. Reilly* (1926) 198 Cal. 465, 467.)  "These transactions are presumed to be in the nature of gifts, advancements or bounties.  In short, the existence of the relationship of parent and child is a circumstance which *prima facie* establishes the presumption of an advancement and thereby rebuts the presumption of a resulting trust." (*Id.* at pp. 467-468.)  In such cases, "'the burden is upon the payor seeking to enforce a resulting trust to prove that he did not intend to make a gift to the transferee.'" (*Altramano v. Swan* (1942) 20 Cal.2d 622, 628, citing Rest.2d Trusts, § 442, cmt. b.)

"'In reviewing a judgment based upon a statement of decision following a bench trial,' we 'apply a substantial evidence standard of review to the trial court's findings of fact.' [Citation.]  Generally, 'our review begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the trial court's factual determinations.'" (*Symons Emergency Specialties v. City of Riverside* (2024) 99 Cal.App.5th 583, 596.)  "'It is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it.'" (*Slone v. El Centro Regional Medical Center* (2024) 106 Cal.App.5th 1160, 1173.)

Substantial evidence supports the trial court's finding of no trust here.  For one, Tsui Chen Chu wrote five checks to Jim Hsieh in 2020 referencing the Corona properties

and a "refund." She testified that the checks were to compensate Jim Hsieh for the amounts those properties had appreciated between the time of original purchase and the Corona Transfers. The fact that Jim Hsieh was compensated for the appreciation in the Corona houses is inconsistent with the idea that Jim Hsieh held his interests in them solely for someone else's benefit. For another, one of the properties other than the Gypsum Creek Property was partially funded with a mortgage, and Jim Hsieh had claimed a mortgage interest deduction on that property on his tax returns. A forensic accounting expert testified at trial that "[y]ou're not allowed to take deductions unless you own that property," thus further undercutting the claim that Jim Hsieh only held the Corona properties in trust.

The Hsiehs argue that the checks and tax deduction do not show Jim Hsieh and Tsui Chen Chu's intent at the time of the purchases. However, the "conduct of the payor and of the transferee subsequent to the transfer" can be relevant when considering whether a trust was intended. (Rest.2d Trusts, § 443, cmt. a.) The Hsiehs in effect ask us to reweigh the evidence, which we do not do in evaluating substantial evidence claims. (*Slone v. El Centro Regional Medical Center*, *supra*, 106 Cal.App.5th at p. 1173.) We accordingly find no error in the trial court's rejection of the Hsiehs' trust defense.

## III.  DISPOSITION

The judgment is modified by striking the Cash Out Loan damages award.  As modified, the judgment is affirmed.  The parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
J.

I concur:

McKINSTER
Acting P. J.

14

[*Winjet Trading, Inc. v. Chu*, E081214]

MENETREZ, J. Concurring.

I concur in the majority opinion. I write separately to address some issues concerning the $400,000 damages award and to explain why, in my view, it must be stricken.

The $400,000 award was supposed to compensate plaintiffs for harm caused by the $400,000 Cash Out Loan's impairment of plaintiffs' ability to enforce the underlying $3.5 million fraud judgment against the Gypsum Creek Property. But plaintiffs have not yet been and might never be damaged by the Cash Out Loan.

First, the judgment in this case provides that plaintiffs hold a $3.5 million judgment lien against the Gypsum Creek Property that is senior to any encumbrance created after October 3, 2019. (See maj. opn., *ante*, at p. 4, fn. 3.) That would make plaintiffs' $3.5 million judgment lien senior to any encumbrance associated with the Cash Out Loan. If that provision of the judgment is valid and enforceable against the bank that made the Cash Out Loan, then plaintiffs have not been damaged by that loan. I doubt, however, that the provision is valid and enforceable against the bank. The bank is not a party to this action, and it has never had an opportunity to litigate any issues of lien priority. The bank may, for example, be able to prove that it is a bona fide encumbrancer and had no notice of the $3.5 million lien until after making the $400,000 loan.

Second, even if the $3.5 million judgment lien is not senior to any encumbrance associated with the Cash Out Loan, plaintiffs still have not yet been damaged by the loan, might never be damaged by it, and certainly will never be damaged by as much as

1

$400,000. Before Jim Hsieh fraudulently transferred his interest in the Gypsum Creek Property to his mother, he owned only a 30 percent interest in that property. Consequently, plaintiffs' damages from impairment of their ability to recover against the property can never exceed 30 percent of the value of the property. So, for example, if the property is sold for $400,000, all of the proceeds of the sale go to the bank in satisfaction of the Cash Out Loan, and plaintiffs get nothing, then plaintiffs would be damaged by 30 percent of the $400,000 value of the property, i.e., plaintiffs' damages would be $120,000. If the value of the property when sold is lower than $400,000, then plaintiffs' damages will be less than $120,000 (because 30 percent of the value of the property will be less than $120,000). And if the value of the property when sold is higher than $400,000, then plaintiffs' damages will still be lower than $120,000, because 30 percent of the value of the property minus plaintiffs' portion of the sale proceeds will be less than $120,000. For example, if the property sells for $500,000, the bank receives $400,000 in satisfaction of the Cash Out Loan, and plaintiffs receive the remaining $100,000, then plaintiffs will be damaged by only $50,000, i.e., 30 percent of the value of the property (30 percent of $500,000 is $150,000) minus the $100,000 that plaintiffs receive from the sale.[1]

---

[1] In all of these examples, for the sake of simplicity I am omitting considerations like loan interest and fees—which might cause the loan payoff amount to be greater than $400,000—as well as fees and closing costs associated with the sale of the property—which will inevitably cause the sale proceeds to be less than the value of the property. Such details do not affect the conclusions that (1) plaintiffs' damages will depend on the

2

In sum, the amount of plaintiffs' damages caused by the Cash Out Loan will depend on both the value of the property when it is sold and the amount owed on the Cash Out Loan at that time. And if the value of the property is high enough, or the loan payoff amount is low enough, or both, then plaintiffs will not be damaged at all, because they will be able to recover 30 percent of the value of the property from the sale proceeds even if the encumbrance associated with the Cash Out Loan has priority.

For all of these reasons, at present it is impossible to determine the amount of damages caused by the Cash Out Loan, but we do know that the damages caused to plaintiffs by that loan will never be $400,000. I therefore agree that the $400,000 damages award must be stricken.

MENETREZ _____

J.

---

value of the property and the loan balance when the property is sold, and (2) plaintiffs' damages will never be as high as $400,000.

3