Filed 12/14/21  Jones v. David CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CHASITY JONES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALKIVIADES DAVID et al.,<br><br>Defendants and Appellants. | B301930<br><br>(Los Angeles County<br>Super. Ct. No. BC649025) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rafael A. Ongkeko, Judge.  Affirmed.

Venable, Ellyn S. Garofalo, Amir Kaltgrad; Glaser Weil Fink Howard Avchen & Shapiro, Fred D. Heather for Defendants and Appellants.

The Bloom Firm, Lisa Bloom, Alan Goldstein; Arick Fudali for Plaintiff and Respondent.

# INTRODUCTION

During the jury trial of Chasity Jones's sexual harassment and related claims against her former boss Alkiviades David, and her employers, FilmOn.TV, Inc. and Hologram USA, Inc. (collectively defendants), David admitted to egregious workplace conduct including screening an obscene video, permitting an exotic dancer to perform in the office, and frequently walking around with his pants down and his genitals tucked between his legs. The jury returned a special verdict largely in Jones's favor and awarded her $591,300 in economic damages, $1,500,000 in past noneconomic damages, and $1,000,000 in future noneconomic damages. After a second phase of trial at which David disregarded a court order to be present, the jury awarded Jones $8,000,000 in punitive damages against David only.

Defendants moved for new trial on several grounds, including insufficient evidence of economic and punitive damages, excessive damages, inconsistent verdicts, and erroneous evidentiary rulings. Defendants subsequently sought to supplement their new trial motion to argue that Jones's claim of gender violence was not properly pleaded and therefore impermissibly tried. The trial court denied the request to supplement but nevertheless addressed the argument in its ruling on the motion for new trial, which it denied on all grounds except as to excessive economic damages. Jones accepted a remittitur that reduced her economic damages from $591,300 to $154,180.

David and Hologram USA, Inc.[1] (collectively appellants) now contend the judgment must be reversed, essentially for the reasons they argued or attempted to argue in the motion for new trial. First, they argue the trial court erred as a matter of law by allowing Jones's gender violence claim to proceed to trial, as it was pleaded only in a stricken first amended complaint. Second, they contend the punitive damages award was not supported by substantial evidence. Third, they assert the trial court abused its discretion by excluding from evidence several of Jones's social media posts. Finally, they contend the court abused its discretion to the extent it denied their motion for new trial.

---

[1] FilmOn.TV, Inc. filed a notice of appeal but subsequently had its corporate powers suspended by the Franchise Tax Board. (See Rev. & Tax. Code, § 23301.) "A corporation that has had its powers suspended 'lacks the legal capacity to prosecute or defend a civil action during its suspension.' [Citation.]" (*City of San Diego v. San Diegans for Open Government* (2016) 3 Cal.App.5th 568, 577.) A corporation thus may not maintain an appeal from an adverse judgement while it is suspended. (*Ibid.*) A corporation may "retroactively validate unauthorized actions taken during a suspension by correcting the condition causing the suspension and applying for a certificate of revivor." (*Longview International, Inc. v. Stirling* (2019) 35 Cal.App.5th 985, 989.) FilmOn.TV, Inc. has not taken that step here. Moreover, its counsel has withdrawn, and a corporation is not permitted to represent itself either in propria persona or through a corporate officer, director, or other employee who is not an attorney. (*CLD Construction, Inc. v. City of San Ramon* (2004) 120 Cal.App.4th 1141, 1145.) As FilmOn.TV, Inc. has neither cured its suspension nor obtained counsel, it cannot maintain its appeal. We accordingly dismiss FilmOn.TV, Inc.'s appeal and affirm the judgment as to FilmOn.TV, Inc. Jones's motion for summary affirmance is denied as moot.

We affirm.

## FACTUAL BACKGROUND[2]

Jones began working at streaming company FilmOn.TV, Inc. as a sales account executive on January 19, 2015. Jones also performed work for Hologram USA, Inc., which creates and sells holograms of deceased celebrities; the jury found that both entities employed her. Both companies were owned and overseen by David from the same office.

From the outset of Jones's tenure, she felt uncomfortable in the workplace. David often came up behind her while she was working and massaged her neck and shoulders and braided her hair without her consent. He required Jones to follow his personal social media pages, and he posted sexually suggestive or otherwise offensive images on them with some regularity. In February 2015, David authorized a male exotic dancer to perform during an office birthday party. In April 2015, David invited Jones into his office, ostensibly to talk about a work matter, and then rubbed his clothed but erect penis against her clothed backside while rubbing his hand over her vaginal area. David admitted all but the latter incident; he conceded, however, that he had "probably" touched a female employee's backside. David also stated, and other witnesses corroborated, that he "walk[ed] out of [his] office with [his] penis tucked between [his] legs"

---

[2] Neither appellants nor Jones summarized the substantive facts adduced at trial in their briefs. We provide a very brief overview here.

"many times" during Jones's tenure, sometimes "in front of 20 people."[3]

Jones began looking for other work in April 2015, after the incident in David's office. She quit in August 2015, but returned to David's employ in October 2015 after he and a trusted coworker assured her that "things are different now."

Things were not different upon Jones's return. Jones and her former coworker, co-plaintiff[4] Elizabeth Taylor, both testified that David made them watch an obscene video, "Two Girls, One Cup," on their work computers; David testified that he screened the video for the office at large in the board room. During a conference call concerning a major business deal, David ran his hand up Jones's thigh, underneath her dress, and touched her vagina over her underwear. On another occasion, while Jones was talking to him about her mother's terminal illness, David spread Jones's legs apart, rubbed his hand on her inner thighs, and again touched her vagina over her underwear. Jones told David "no" during these incidents, but she did not report any of them; neither FilmOn.TV, Inc. nor Hologram USA, Inc. had a human resources department, and Jones did not feel comfortable

---

[3] David dubbed this action a "mangina," a term he claimed to have coined. Per his testimony, "[i]t means that you hide your genitals behind your thighs and pretend that you have a vagina, but you are a man." David explained that his underwear was off when he did this, but his "genitals were not exposed." Counsel rejected his offers to demonstrate.

[4] Jones and Taylor jointly filed the lawsuit underlying this appeal. The court granted a defense motion for separate trials; Jones's case was tried first.

reporting the incidents to David.[5]  She also did not believe any reports would be taken seriously.

Jones's employment was terminated in November 2016, approximately one month after the third vagina-rubbing incident. Jones testified that she was not given a reason for her termination; she had never been reprimanded or received a poor performance review, and she had recently closed a very large deal.

Jones got a new job in January 2017.  But she struggled with insomnia and an inability to concentrate, which she attributed to her experiences working for defendants.  Jones went on disability in June 2017.  A clinical psychologist who saw Jones for six sessions between February 2017 and May 2018 diagnosed her with post-traumatic stress disorder (PTSD).  The psychologist testified that Jones's symptoms included difficulty sleeping, difficulty concentrating, increased levels of anxiety and depression, paranoia, irritability, indecisiveness, and "anhedonia," which the psychologist defined as "the inability to experience pleasure in everyday life."  A forensic psychologist who evaluated Jones opined that Jones had many symptoms consistent with PTSD, and that Jones's psychological distress was caused by her experiences working with David, his conduct toward her, and the lack of a forum in which she could report the abuse.

---

[5] There was a sign that said "HR Headquarters" hanging near David's office.  The sign said "Her-Ass" at the top, followed by the words, "'We Will Give You Just The Tip,'" and a photo of a man standing behind a woman with his hands on her breasts. David testified that he did not know where the sign came from, but "didn't think that it was inappropriate."

## PROCEDURAL HISTORY

*Original Complaint and Pretrial Proceedings*

On February 2, 2017, Jones and Taylor jointly filed a complaint against David, FilmOn.TV, Inc., Hologram USA, Inc., and several other business entities associated with David.[6]  The complaint asserted 11 causes of action against the defendants, including sexual harassment, wrongful termination, retaliation, sexual battery, common law battery, sexual assault, and intentional infliction of emotional distress.  The complaint did not assert a cause of action for gender violence.  All defendants jointly answered the complaint on March 15, 2017.  David filed a cross-complaint the same day; plaintiffs answered the cross-complaint on April 28, 2017.

On September 6, 2017, all defendants jointly filed a motion for judgment on the pleadings as to several causes of action asserted by Taylor only.  Approximately one week later, on September 14, 2017, plaintiffs filed a first amended complaint (FAC) that added a twelfth cause of action against David for gender violence. (Civ. Code, § 52.4.)  Plaintiffs did not seek or obtain leave of court or defendants' stipulation before filing the FAC.  (See Code Civ. Proc., § 472, subd. (a).)

The trial court heard the defense motion for judgment on the pleadings on September 28, 2017.  A court reporter was present, but the record does not contain a transcript of the proceedings.  The court issued a minute order granting in part and denying in part the motion for judgment on the pleadings.  The minute order also stated, "The court orders the improperly filed First Amended Complaint stricken," and directed the

---

[6] At trial, Jones dismissed all of the business entities other than FilmOn.TV, Inc. and Hologram USA, Inc.

moving parties—defendants—to prepare and serve notice of the ruling. No notice of ruling is in the record. The court's order striking the FAC does not appear in the online docket summary.

Defense counsel died on March 9, 2018, and all defendants substituted in new counsel on May 30, 2018. David filed a first amended cross-complaint alleging causes of action for battery and sexual battery on June 27, 2018. The cover page noted the filing but not the striking of the FAC. Plaintiffs answered the first amended cross-complaint on September 21, 2018.

*Requests for Financial Information*

The court set Jones's claims and David's cross-claims against her for trial on April 2, 2019. Although the date was later continued to April 15, 2019, discovery closed on March 1, 2019. (Code Civ. Proc., § 2024.020.) On March 13, 2019, Jones's counsel served on defense counsel via U.S. mail an "Amended Notice in Lieu of Subpoena to Defendant Alkiviades David to Appear at Trial."[7] The notice, made pursuant to Code of Civil Procedure section 1987, subdivision (b), requested David's presence at trial but did not request production of any documents.

On March 26, 2019, Jones filed a motion under Civil Code, section 3295, subdivision (c) seeking discovery of defendants' financial conditions for punitive damages purposes. The motion had a hearing date of May 7, 2019—well after the expected conclusion of the trial—and the court denied Jones's ex parte request to advance the hearing date.

Also on March 26, 2019, Jones's counsel emailed and overnighted to defense counsel a civil subpoena duces tecum

---

[7] The record makes no mention of the original notice.

(subpoena) ordering David to appear on the first day of trial, April 15, 2019. The subpoena also ordered David to bring with him five categories of documents pertaining to his financial condition[8]: (1) "The 2017 tax returns of Defendant [David]." (2) "The 2018 tax returns of Defendant [David]." (3) "The 2019 tax returns of Defendant [David]." (4) "All mortgage documents of any property owned directly or indirectly by Defendant [David] reflecting loans made to, cosigned by, or made for the benefit of [David] for the period of March 2017 to March 2019." (5) "All title reports of any property owned directly or indirectly by Defendant [David] for the period March 2017 to March 2019." The subpoena was addressed to David "c/o" his counsel at his counsel's law firm address; it was not served on David personally, either by email or in paper form.

*Operative Complaint*

On April 15, 2019, the first day of trial, Jones's counsel represented in response to several inquiries by the court that the FAC was the operative pleading. The court asked the parties if they agreed that the FAC was the operative complaint, and defense counsel responded, "That was our understanding, Your Honor." The defense filed an answer to the FAC later in the day, and the liability phase of the trial commenced.

*David's Courtroom Outburst*

All of the claims remaining in the FAC, including the gender violence claim, proceeded to trial. Jones called David as a witness during her case-in-chief. Almost immediately, David began insulting Jones, her counsel, and the litigation process.

---

[8] The subpoena duces tecum also ordered David to produce numerous documents pertaining to the corporate defendants' financial conditions. Those requests are not relevant here.

9

Despite the court's repeated admonishments, David's behavior escalated. Within minutes[9], he proffered his American Express Black credit card to Jones, telling her, "Take my card. Take my card. Here, take my card. . . . Go and buy whatever you want." David subsequently stated or shouted, "It's a Black Amex from Switzerland, if you would like, madam? Is that interesting? Would you like that now or after or --." He also said, "Oh, fuck it. Just enter a default judgment," before leaving the stand and exiting the courtroom.

In a sidebar discussion immediately following David's exit, the court stated, "[H]is shouting was so loud that there's no way he would have – he wasn't listening to anybody. I think he was totally out of control. And he – you know, if he had the chance he might have assaulted somebody and pushed somebody around. . . . Half his shirt came off, and he had to pull his shirt down. And . . . the jury saw all this. I didn't really have to stop anything because he was controlling the courtroom, much to my chagrin. . . . [H]e definitely had a short fuse, and he was ready to say what he did, from my estimation. He just came out and started saying whatever he wanted to say, a lot of it profane and a lot of it very personal." Defense counsel stated that the court's remarks were "an accurate recounting of what happened in the courtroom."

---

[9] According to the reporter's transcript, David took the stand at 11:23 a.m. on the sixth day of trial. By 11:35 a.m., the court had asked defense counsel to ask David to leave and threatened to call the sheriff. After he left the courtroom with the bailiff, David did not return for the remainder of trial. Excerpts from his deposition were later read into the record.

*Production of Financial Information*

Though David appeared at trial as requested, he did not bring any financial documents. On the third day of trial, Jones's counsel advised the court that David had not produced the requested materials. Defense counsel explained, "we are not disputing that they are entitled to some of this financial information – a balance sheet, a P&L [profit and loss] statement, that kind of thing for the individual"; instead, the defense challenged the requests as overbroad, particularly as to the corporate defendants. The court stated, "[w]e need to have a deadline to produce these documents, though, or have some sort of hearing." The court asked the parties to brief any issues and told the defense to produce any documents that it agreed to produce in two days, on Friday. It also asked defense counsel what they agreed to produce "at this point," to which counsel responded in relevant part, "I would see what Mr. David personally has, P&L statements and so forth and produce it."

On Monday, April 22, 2019, the fifth day of trial, defense counsel informed the court that they intended to produce David's personal tax returns and were still attempting to determine if he had any financial statements and were "doing [their] best to get it." Defense counsel also apologized for the delay, noting that many accountants were on vacation following the recent tax filing deadline. The court acknowledged the difficulty but cautioned counsel, "[i]f we don't get anything fairly substantive tomorrow, at least some commitment, I'm going to have to start imposing some sanctions or something." The court suggested that such sanctions could include restrictions on David's ability to object to unspecified issues pertaining to punitive damages.

11

The following day, defense counsel reported that they had heard from an accountant and were waiting for him or her to email the documents. The court denied Jones's requests for default or terminating sanctions. However, after defense counsel asserted that David had not been properly served with the subpoena, the court found that, "based on all of the representations made," Jones had reasonably relied on defense counsel to produce the documents despite any service defects in the subpoena. The court further stated that it was "going to enforce these as the law requires by imposing - - I think it has to be an evidentiary sanction on the punitive damage aspect unless it's produced, you know, at some point. We keep getting promises." It continued, however, that it was "going to hold off on the evidentiary sanctions" until we "see what's produced."

After the jury was excused for the day, defense counsel produced David's tax returns for 2016 (which were not requested) and 2017.[10] Defense counsel asserted that David did not own any property, such that there were no documents responsive to Jones's other requests. The court ordered David to appear in person for the punitive damages phase of trial. The court cautioned, "If he doesn't show up, then I'll have to take some sort of discovery sanction, if you will, maybe allow a little bit more leeway in establishing financial condition." It also cautioned Jones, however, that she would still need to present something "admissible that is not automatically reversible."

*Liability Phase Special Verdict*

The jury returned a 53-question special verdict largely in favor of Jones and against defendants. It found Jones

---

[10] It is unclear why the requested 2018 returns were not produced.

12

experienced and David participated in a hostile work environment at both FilmOn.TV, Inc. and Hologram USA, Inc.; Jones was wrongfully discharged from both companies for retaliatory reasons; David committed sexual battery and gender violence against Jones; David intentionally inflicted emotional distress on Jones; and David acted with malice, oppression or fraud.  The jury found in David's favor, however, on Jones's causes of action for common law battery and assault.  The jury awarded Jones $591,300 in economic damages against FilmOn.TV, Inc. and Hologram USA, Inc.:  $140,000 for past lost wages, $1,300 for past medical expenses, $350,000 in future lost wages, and $100,000 for future medical expenses.  It also awarded her $3,000,000 in past noneconomic damages and $1,000,000 in future noneconomic damages against all three defendants.[11]

After the verdict was read, and the court reminded the jury that the punitive damages phase of trial would begin the following day, the jury foreperson told the court that she had "misunderstood" the punitive damages portion of the special verdict form.  She stated, "I feel like I did not instruct the jury correctly about the punitive damages.  I thought we were awarding that already."  A few other jurors had the same understanding.  The following morning, the court discussed the issue with counsel in chambers; Jones's counsel put the following on the record:  "[G]iven the comments from Juror 12 yesterday that there may have been confusion or a mistake that the jury be told that in light of that comment, if there is an issue, they go

---

[11] The jury did not consider or return a verdict on David's cross-complaint; the court granted Jones's motion for a nonsuit at the close of trial.

13

back in, deliberate, fix any problems that may have occurred, fix any mistakes that may have occurred, come back in with a corrected verdict, and then we go to phase two for punitives." The court echoed these comments: "I think to have a correct verdict for this phase, the jury should be instructed to go back to the jury room and give us their verdict on all of the issues, in particular the damage issue, which seems to be the issue anyway." Defense counsel "reserve[d] our right to object," but did not explicitly make any objection or propose an alternative procedure.

In accordance with the parties' discussion, the court instructed the jurors to redeliberate and indicate any changes on the special verdict form. After deliberations, the jury changed only the past noneconomic damages, which it reduced from $3,000,000 to $1,500,000, and the total damages, which it reduced from $4,591,300 to $3,091,300. The court entered the corrected special verdict form as the verdict for the first phase of trial.

*Punitive Damages Phase*

The matter then proceeded to the punitive damages phase. David did not appear, despite the court order requiring him to. Jones introduced David's 2016 and 2017 tax returns, which exceeded 500 pages, without objection. Jones then called as a witness one of her attorneys, who testified that she had searched for "Alki David, billionaire" on YouTube the previous day. The search returned "several" videos identifying David as "the author" or "poster," and another depicting David but identifying a different individual as the poster. Counsel did not recall the dates of the videos but believed they were posted in 2011 and 2017. Counsel watched the videos and recognized the person

they depicted as David; she downloaded but did not edit the videos. The court admitted four of the videos into evidence over defense counsel's repeated foundation objections. Each of the videos depicted David referring to himself as a "billionaire." In one of the videos from 2011, David also referred to "my mansion in Beverly Hills." In another, he appeared in what defense counsel described as a Bentley convertible.

The court also admitted into evidence a letter that Jones's counsel obtained from the website of the United States Securities and Exchange Commission (SEC), again over a foundation objection by the defense. The letter, signed by David and dated November 21, 2017, stated that David, "a majority shareholder in Hologram USA Network, Inc., [*sic*] and its subsidiaries, (the 'Company') will be providing full financial support to meet the working capital needs of Hologram USA Networks, Inc., until March 31, 2019 or until a time at which the Company is able to fully support its working capital needs." It continued, "I am a member of the Leventis-David family, whose holdings include manufacturing, bottling plants, property and shipping. Since 2008, I am one of the principal shareholders of Leventis-David group, which owns Coca-Cola Hellenic bottling plants in various countries in Africa. Additionally, my companies include the Internet-based television provider FilmOn, and other on-line businesses. [¶] Support may include, [*sic*] cash support to meet operating expenses and other legal obligations. [¶] I confirm that the financial support provided to Hologram USA Networks Inc., until [*sic*] at least March 31, 2019 and will ensure that it will remain a going concern till that date." Jones did not introduce any further evidence; the defense introduced none.

In her closing argument, and again during rebuttal, Jones's counsel pointed out that David was absent from the proceedings in violation of court order. She asserted that David's absence prevented him from disputing his previous descriptions of himself as a billionaire, and emphasized portions of his tax returns reporting substantial assets at his numerous companies and ownership of "financial accounts" in Switzerland, Cyprus, Greece, the United Kingdom, and the Isle of Man. In rebuttal, she reminded the jury about the credit card incident during the liability phase of trial. Jones's counsel asked the jury to impose $30,000,000 of punitive damages on David. In the defense closing, counsel emphasized that Jones bore the burden of proving David's financial resources and argued that she failed to do so. Defense counsel also pointed out that David paid nearly $2,000,000 in income taxes despite reporting negative income, and urged the jury to consider his businesses' "bottom line," not just their assets, to conclude that David "has no ability to pay punitive damages in this case."

The jury awarded Jones $8,000,000 in punitive damages against David; it did not impose punitive damages on either FilmOn.TV, Inc. or Hologram USA, Inc. The court entered judgment on June 12, 2019. Defendants filed a notice of intention to move for new trial on June 28, 2019.

*Motion for New Trial*

Defendants filed a motion for new trial on July 7, 2019. They argued that the evidence was insufficient to support both the economic and punitive damages awards. With respect to the punitive damages award, they argued that David's 2016 and 2017 tax returns did not show his net worth at the time of trial, the lack of evidence of David's net worth was attributable to Jones's

16

lack of diligence and specificity in making discovery requests, the court abused its discretion by ordering David to produce documents in response to an improperly served subpoena, the videos and SEC letter were inadmissible and did not show David's current net worth in any event, and David was prejudiced by Jones's counsel's suggestion during closing that he had a burden to present evidence or rebut that presented by Jones.

Defendants also contended that jury confusion resulted in an excessive punitive damages award that could not be reconciled with the original verdict rendered, as well as inconsistent verdicts finding David liable for sexual battery and gender violence but not liable for ordinary assault or battery. Finally, they contended the court abused its discretion by precluding them from introducing certain social media posts made by Jones to impeach her testimony about being fearful of men and struggling to experience pleasure in daily life. They did not make any argument about the FAC or the validity of the gender violence claim.

On July 22, 2019, before Jones filed her opposition to the motion, defendants filed an ex parte application for leave to file a supplemental brief in support of the motion. They asserted they had only recently discovered the court's September 28, 2017 minute order striking the FAC, and claimed Jones's counsel had misled them and the court into proceeding to trial on an invalid pleading. In their attached proposed supplemental brief, they argued they were prejudiced and the jury's verdict was "tainted" by the gender violence claim, which had not been pled in the original complaint. Jones opposed the ex parte request, which the court denied after a hearing. Defendants subsequently filed a reply in support of the motion for new trial.

The court heard the new trial motion on August 16, 2019 and took the matter under submission. On August 26, 2019, it issued a written ruling conditionally granting in part and denying in part the motion. The court conditionally granted the portion of the motion addressing economic damages. It found that the economic damages were largely unsupported by substantial evidence, and granted a new trial on that issue unless Jones consented to a reduction of economic damages from $591,300 to $154,180. Jones accepted the remittitur on September 11, 2019.

The trial court denied the remainder of the new trial motion. With respect to punitive damages, the court rejected as "misplaced" and "lack[ing in] significance" defendants' "reliance on procedural issues such as service of a subpoena or lack of a CCP § 1987(c) notice," because courts are permitted to order appearance and production of documents once culpability for punitive damages is established regardless of the pretrial discovery undertaken. It also found that defendants "stalled" in their production of documents, "eventually produc[ed] only limited and self-serving tax returns," and disobeyed the court order to appear. "Notwithstanding Defendants' [*sic*] disobedience of the court's orders, and his minimal document production," the court found there "was sufficient admissible evidence of David's financial condition at the time of trial separate and apart from the YouTube videos," which it agreed "should not have been admitted." The court specifically pointed to the SEC letter and the "substantial holdings" documented in the tax returns. In the alternative, the court concluded that "even assuming that the evidence in the second phase was insufficient to show his financial condition at the time of trial, David's failure to comply

18

with a court order to be present as a witness during the punitive damages phase estops him from claiming insufficient evidence."

The court rejected defendants' assertions of jury confusion, with respect both to damages and the verdicts on the sexual battery and gender violence claims. It found that any confusion in assessing damages was mitigated by the redeliberation, and the jury's ultimate noneconomic and punitive damages awards were supported by substantial evidence and reasonable in amount. It added, "in the court's view, Plaintiffs' successful claims of sexual harassment and IIED alone merit the noneconomic and punitive damages awarded." The court further concluded that the sexual battery and gender violence verdicts were not inconsistent with the finding that David was not liable for ordinary assault or battery. It reasoned that the "evidence clearly supported liability verdicts for sexual battery and gender violence," and it "was not improper for the jury to consider the lesser assault and battery claims superfluous given their findings on the more serious allegations."

The court also addressed, as a "miscellaneous issue," defendants' belatedly raised claim that the FAC was not the operative complaint. It concluded that the issue was "waived and/or subject to estoppel" in light of defendants' agreement that the FAC was the operative complaint after the court's explicit inquiry and subsequent conduct consistent with that agreement. The court further found that "[a]ll parties had full and fair opportunity to litigate the FAC as to Plaintiff Jones." The court found it unnecessary to address the remaining issues raised in the new trial motion, "as they are insufficient grounds for a new trial."

19

The court entered an amended judgment on September 26, 2019. Under that judgment, FilmOn.TV, Inc. and Hologram USA, Inc. were jointly and severally liable for $2,654,180 in damages, and David was liable for $10,500,000 in damages. Defendants timely appealed.

## DISCUSSION

### I. *FAC and Gender Violence Claim*

#### A. *Background*

"Gender violence" is "a form of sex discrimination" that includes "physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction." (Civ. Code, § 52.4, subd. (c)(2).) "Any person who has been subjected to gender violence may bring a civil action for damages against any responsible party. The plaintiff may seek actual damages, compensatory damages, punitive damages, injunctive relief, any combination of those, or any other appropriate relief. A prevailing plaintiff may also be awarded attorney's fees and costs." (Civ. Code, § 52.4, subd. (a).)

Jones added a claim of gender violence when she filed her FAC; the claim was not pled in the original complaint. The court struck the FAC in September 2017, and Jones did not seek or obtain leave to file another pleading. Approximately 18 months later, on the first day of trial in April 2019, the court asked the parties if the FAC was the operative complaint. Jones's counsel stated that it was. Appellants' counsel confirmed, "That was our understanding," and subsequently filed an answer to the FAC. The gender violence claim was tried to the jury, which found in Jones's favor.

Appellants assert that they first discovered the FAC had been stricken in July 2019, while preparing for trial of co-plaintiff Taylor's claims.[12] They attempted to add the issue to their already-filed motion for new trial, but the court denied their ex parte request to file a supplemental brief. The court nevertheless addressed the issue in its ruling on the motion for new trial. The court found that it was waived, as "[t]he entire trial was necessarily premised on the viability of the FAC and it proceeded accordingly," and "[a]ll parties had full and fair opportunity to litigate the FAC." In the alternative, the court found that "the parties are deemed to have agreed the FAC was the operative pleading for trial and are estopped from maintaining otherwise."

B.    *Analysis*

Appellants contend the trial court erred as a matter of law by permitting trial of, instructing the jury on, and entering judgment on the gender violence claim asserted in "the dismissed and inoperative first amended complaint." They accuse Jones's counsel of "deception" and "misrepresentation" in telling the court that the FAC was the operative pleading, and argue that any agreement to proceed on the FAC was invalid in light of the

---

[12] Appellants' counsel—who filed the briefing in this appeal but withdrew prior to oral argument—did not represent them at the time the FAC was stricken. They substituted into the case after appellants' original counsel died in early 2018. According to a declaration filed in the trial court, counsel was "informed" that original counsel "did not maintain electronic files" and was "provided with the paper files related to this action by the trustee of [original counsel]'s estate." The minute order striking the FAC was not among the paper files. Counsel learned the FAC had been stricken when they "downloaded the September 28, 2017 minute order from the Court's website."

21

alleged misrepresentation.  They further argue that they "did not waive the error" because they objected to the gender violence jury instruction proffered by Jones.  They assert that trying the gender violence claim prejudiced them, because the claim's name "is in itself prejudicial," and the "jury awarded emotional distress and punitive damages . . . based in whole or part on a gender violence claim that should never have been submitted to the jury."

Jones responds, and we agree, that appellants failed to preserve this claim of error.  "Where the parties try the case on the assumption that a cause of action is stated, [or] that certain issues are raised by the pleadings, . . . neither party can change this theory for purposes of review on appeal."  (9 Witkin, Cal. Procedure (5th ed. 2020), § 407.)  This "theory of trial" doctrine is long-established; more than a century ago, California appellate courts concluded that a party should not "be permitted to stand by and without objection allow an issue to be tried as though properly presented by the pleadings and on appeal escape the consequences by claiming that the complaint failed to present such issue."  (*Slaughter v. Goldberg, Bowen & Co.* (1915) 26 Cal.App. 318, 325.)  That is largely what happened here.  At the outset of trial, when the court directly inquired about the status of the FAC, defense counsel said it was their "understanding" that the FAC was the operative complaint.  The court expressed some uncertainty about this:  "I don't have the first amended. I really thought that was stricken.  But if you agree that that's what it is, that's fine."  Rather than seek clarification or lodge an

objection,[13] defense counsel simply proffered a copy of the FAC to the court and proceeded to trial on the merits. Raising the issue after filing a motion for new trial did not remedy the lack of timely objection.

Appellants contend they "preserved such objection and did not waive the error" by objecting, both prior to and after this discussion with the trial court, to Jones's proposed pattern instruction on gender violence. We are not persuaded. Appellants objected to the pattern jury instruction not as an improper claim but rather as being "duplicative of the sexual battery cause of action." This objection, which the court overruled, was not sufficient to apprise Jones or the court that appellants objected to the validity of the gender violence claim. Appellants further assert that "the law is clear that '[p]arties do *not* waive error by "acquiescence" when they object to trial court error and then take "defensive" action to lessen the impact.' [Citation.]" (*State Compensation Insurance Fund v. Superior Court* (2010) 184 Cal.App.4th 1124, 1129.) They are correct that it is generally prudent for a party who has unsuccessfully objected to a "defective pleading, inadmissible evidence, erroneous instructions, etc.," to "meet the opposing case on the merits" rather than "stand firm, risking everything on the objection." (9 Witkin, Cal. Procedure (5th ed. 2020), § 399.) However, appellants affirmatively acquiesced to the FAC; they did not object, get overruled, and proceed "defensively."

---

[13] If defendants had objected, the court would have had discretion to grant Jones permission to amend the complaint to include the omitted cause of action or to conform to proof. (See Code Civ. Proc., §§ 469, 576.)

Appellants also argue that their "acquiescence" was predicated on "deception" by Jones's counsel. The unsupported assertion of improper conduct by opposing counsel is not well-taken. Appellants have not pointed to any evidence that Jones's counsel knowingly misled the court about the status of the FAC.[14] The trial court noted that there was some confusion or dispute as to whether the FAC was operative or stricken, and nothing in the record suggests that any such confusion was disingenuous. Indeed, defense counsel asserts that they were genuinely unaware of the order, even though it was available for download from the court's website.

Even if the issue were not waived, we are not persuaded appellants have shown they were prejudiced by litigating the FAC. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609; Code Civ. Proc., § 475.) The appellate record supports the trial court's observation that "[a]ll parties had full and fair opportunity to litigate the FAC as to Plaintiff Jones." Appellants had and took advantage of the opportunity to thoroughly cross-examine Jones and the witnesses she presented. They assert that the "prejudicial connotation" of the phrase "gender violence" alone prejudiced them and "may have been the only basis for which the jury awarded punitive damages." The assertion is speculative, as several of Jones's claims authorized the award of punitive

---

[14] On October 12, 2021, David filed a petition for writ of error *coram vobis* vacating the judgment and directing the trial court to reconsider its ruling on the motion for new trial (Case No. B315626). David asserted that new evidence—a declaration Jones's counsel filed in opposition to David's motion for sanctions—showed that Jones's counsel had been mistaken that the FAC was the operative pleading. We denied the writ petition on October 28, 2021.

damages; the trial court observed that the "sexual harassment and IIED [claims] alone merit the noneconomic and punitive damages awarded." The suggestion that the phrase "gender violence" itself prejudiced defendants is not supported by the record. Jones's counsel did not call attention to the gender violence claim or even use the phrase "gender violence" in her closing or rebuttal arguments; the jury heard and saw the phrase only in the context of the jury instructions and special verdict form. Appellants also contend that the civil gender violence statute is aimed at curbing "criminal conduct," but the jury was not instructed on the portion of the statute that required the conduct to be criminal in nature. (See Civ. Code, § 52.4, subd. (c)(1).) To the contrary, the jury was instructed that the alleged conduct need not "have resulted in criminal complaints, charges, prosecution, or conviction."

II.   *Punitive Damages*

A.   *Background*

As summarized in detail above, Jones sought several categories of financial documents from David pursuant to a subpoena. David's counsel repeatedly represented that he would produce the documents, but delayed in doing so. When counsel eventually asserted that the subpoena was improperly served, the court found that, "based on all of the representations made," Jones had reasonably relied on defense counsel to produce the documents despite any service defects in the subpoena. On the eve of the punitive damages phase of trial, David's counsel produced approximately 500 pages of David's 2016 and 2017 tax returns. The court ordered David to personally appear as well.

David disregarded the order to personally appear at the punitive damages phase. Jones introduced into evidence the tax

returns; a letter David wrote assuring the SEC that he, a principal shareholder of a group that owned Coca-Cola bottling plants in Africa, would personally bankroll Hologram USA Network(s), Inc. and its subsidiaries for two years; and four YouTube videos in which David stated he was a billionaire. Jones requested $30,000,000 in punitive damages. The jury awarded her $8,000,000, against David only.

Appellants challenged the sufficiency of the evidence of David's net worth or financial condition in their motion for new trial. The trial court rejected the challenge and found not only that the evidence of David's financial condition was sufficient, but also that David's failure to obey the court order to appear estopped him from challenging the sufficiency of the evidence.

B.    *Governing Principles*

Civil Code section 3294, subdivision (a) permits an award of exemplary or punitive damages "for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." The purpose of punitive damages is to punish wrongdoing and deter future misconduct, both by the defendant and by other members of the public at large. (*Stevens v. Owens-Corning Fiberglas Corp*. (1996) 49 Cal.App.4th 1645, 1658.) The award must be tailored to a defendant's personal financial condition to effectively serve these purposes. "The ultimately proper level of punitive damages is an amount not so low that defendant can absorb it with little or no discomfort [citation], nor so high that it destroys, annihilates, or cripples the defendant. [Citations.]" (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 621-622.)

For the jury—and the reviewing court—to "ascertain whether a punitive damages award is properly calibrated so as to inflict economic pain without financially ruining the defendant, it needs some evidence about the defendant's financial condition and ability to pay the award." (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 192 (*Soto*).) Thus, "an award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 109 (*Adams*).) The plaintiff bears the burden of introducing such evidence (*id.* at pp. 108-109); punitive damages may not be based on speculation (*id.* at p. 114).

"A defendant's records may be the only source of information regarding its financial condition." (*Soto*, *supra*, 239 Cal.App.4th at p. 192.) A plaintiff may seek to obtain such records by requesting a court order for them pursuant to Civil Code section 3295, subdivision (c), or by using ordinary subpoena procedures. (*Id.* at pp. 192-193.) A plaintiff who fails to do so, or requests only records insufficient to carry its burden, runs the risk of undermining an otherwise valid claim for punitive damages. (*Id.* at p. 194.)

"It is the province of the trial court to ensure that both parties comply with the letter and spirit of [punitive damages] discovery provisions." (*Soto*, *supra*, 239 Cal.App.4th at p. 194.) The trial court thus has the discretion to order a defendant to produce evidence of his or her financial condition even if the plaintiff fails to seek such evidence using the tools available to him or her. (*Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 609 (*Davidov*).) Likewise, a trial court may decline to make such an order. (*I-CA Enterprises, Inc. v. Palram Americas, Inc.*

27

(2015) 235 Cal.App.4th 257, 284.)  Where the court orders a defendant to produce evidence, the defendant must comply with the order.  (*Soto*, *supra*, 239 Cal.App.4th at p. 194; *StreetScenes v. ITC Entertainment Group, Inc.* (2002) 103 Cal.App.4th 233, 243.)  The consequences of failing to comply may be dire; a minimally supported award of punitive damages may be upheld if "the dearth of evidence of the defendant's financial condition is attributable to the defendant's failure to comply with discovery obligations or orders." (*Soto*, *supra*, 239 Cal.App.4th at p. 194.)

"[T]here is no one particular type of financial evidence a plaintiff must obtain or introduce to satisfy its burden of demonstrating the defendant's financial condition."  (*Soto*, *supra*, 239 Cal.App.4th at p. 194.)  As a general rule, "[e]vidence of a defendant's income, standing alone, is not 'meaningful evidence'" of his or her financial condition.  (*Ibid.*)  This is because a defendant's outlays and obligations also inform his or her financial condition.  (See *ibid.*)  "'[T]here should be some evidence of the defendant's actual wealth' [citation], but the precise character of that evidence may vary with the facts of each case." (*Id.* at pp. 194-195.)  "The evidence should reflect the named defendant's financial condition at the time of trial."  (*Id.* at p. 195.)

We review the record under the substantial evidence standard.  (*Soto*, *supra*, 239 Cal.App.4th at p. 195.)  "'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value."  (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)  "The focus is on the quality, rather than the quantity, of the evidence."  (*Ibid.*)  Inferences that are the product of logic and reason may be substantial evidence; speculation and conjecture may not.  (*Ibid.*)

"The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." (*Id.* at p. 652.)

C.    *Analysis*

Appellants present a multi-pronged attack on the sufficiency of the evidence establishing David's financial condition.  Jones responds at the threshold that David's failure to obey the court's order to appear at the punitive damages phase of trial "estops him from challenging the sufficiency of [Jones's punitive damages] showing."  Appellants reply that they produced all requested documents in their possession despite the allegedly defective nature of Jones's subpoena, such that she "has not even shown that David violated any order to produce documents that would support her estoppel theory."  They further contend that the authority on which Jones relies is distinguishable.

"A defendant who fails to comply with a court order to produce records of his or financial condition may be estopped from challenging a punitive damage award based on a lack of evidence of financial condition to support the award." (*Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1337.)  The reason for this rule is that a defendant who fails to produce records that are the only source of financial information to a plaintiff "improperly deprive[s] plaintiff of the opportunity to meet his burden of proof on the issue," and it is unfair to let such a defendant challenge the absence of evidence that he or she failed to provide. (*Mike Davidov Co. v. Issod*, *supra*, 78 Cal.App.4th at p. 609.)

Here, David eventually produced some of the financial documents Jones had requested. Jones's counsel indicated to the

29

court that she had additional evidence of David's wealth that would only be admissible through David as a witness. The court ordered David to be present, apparently so Jones could call him for this purpose. The court told the parties, "If he doesn't show up, then I'll have to take some sort of discovery sanction. After David failed to appear, the court stated, "All we have now is perhaps a sanction that he cannot object to the financial condition once it's awarded. . . . He's basically waived it, or he's estopped from doing it, because he's elected [not] to be here in violation of a court order. So that's - - that's a pretty good sanction. I don't understand what more we can do." The court did not reduce this sanction to a formal order, though it did conclude in its ruling on the motion for new trial that "David's failure to comply with a court order to be present as a witness during the punitive damage phase estops him from claiming insufficient evidence, just as failure to produce records leads to the same result."

We agree with the trial court. Although David eventually produced most of the tax records Jones requested, he disobeyed the court's direct order to appear as a witness at the punitive damages phase of trial.[15] He thus frustrated Jones's efforts to introduce additional evidence of his financial condition and meet her burden of proof. Appellants may not be heard to complain about the adequacy of the evidence now. They contend that the primary authority Jones cites in support of this proposition, *Mike Davidov Co. v. Issod*, *supra*, 78 Cal.App.4th 597, is

_____

[15] Appellants do not mention this order in their briefing. They instead maintain that Jones "has not even shown that David violated any order to produce documents that would support her estoppel theory."

30

distinguishable because the holding in that case "narrowly applies to a trial court's *independent* order to produce documents *following* a determination of liability." We fail to see the distinction, as the court independently ordered David to appear following the determination of liability. Even if we were to find the case law distinguishable, however, we are not persuaded by appellants' contentions that the punitive damages award is unsupported by substantial evidence.

Appellants first argue that the trial court abused its discretion by ordering David to produce any financial documents at all, because Jones failed to serve the subpoena on him personally. Citing the reporter's transcript,[16] they point out that they objected to the service, and assert that "the Court enforced the subpoena, finding that David waived personal service, and counsel impliedly agreed to accept service, because there was no objection to the defective service, leading Plaintiff 'down the [primrose] path.'"

We find no abuse of discretion. As noted above, the trial court is empowered to order a defendant to produce documents even if a plaintiff makes no request whatsoever. (*Mike Davidov Co. v. Issod*, *supra*, 78 Cal.App.4th at p. 609.) Here, Jones sought financial documents by subpoena, but did not serve the request on David personally. Even if that service was improper, David's counsel repeatedly represented that it would be producing at

---

[16] Both parties' briefs include citations only to the relevant page numbers of the reporter's transcript, without any volume designations. We remind counsel that "[e]ach brief" must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Cal. Rules of Court, rule 8.204(a)(1)(C).)

least some of the requested documents. They explicitly told the court—and Jones's counsel—that they were "not disputing that they are entitled to some of this financial information," and affirmatively agreed to "see what Mr. David personally has, P&L statements and so forth and produce it." A few days later, they reiterated that they intended to produce David's tax returns as soon as they received them from his accountant. Only after the court threatened sanctions for the lack of production did defense counsel object to the service of the subpoena. Appellants contend that they had no obligation to raise their objection earlier, and further contend that they had an ethical obligation not to do so. Regardless, they were under no obligation to make repeated promises of production. They nevertheless affirmatively stated, on multiple occasions, that certain documents would be forthcoming. The court did not err in holding the defense to those representations.

Appellants next contend that the documents they produced, David's 2016 and 2017 tax returns, did not sufficiently demonstrate David's financial condition at the time of trial. They assert that the returns show that David's adjusted gross income for both years was significantly negative—approximately -$3,230,000 in 2016 and approximately -$1,750,000 in 2017, and "[s]uch evidence hardly establishes . . . David's financial condition such that an $8,000,000 punitive damages award would deter, rather than destroy, him." They also argue that Jones's counsel cherry-picked large numbers out of the tax return without providing proper context or expert testimony, and that the tax returns were too dated to show David's financial condition at the time of trial.

As appellants point out, despite their own reliance on David's negative reported income, "evidence of the defendant's income, standing alone, is wholly inadequate" to establish his or her financial condition.  (*Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064; see also *Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1152; *Mike Davidov Co. v. Issod*, *supra*, 78 Cal.App.4th at p. 607.)  Similarly, evidence of assets cannot demonstrate financial condition without concomitant evidence of liabilities.  (*Soto*, *supra*, 239 Cal.App.4th at p. 194.)  The more than 500 pages of tax returns admitted into evidence in this case contained far more information than David's income and assets.  Both returns showed that David was the sole shareholder of upwards of a dozen corporations based in locales such as the United Kingdom, the Virgin Islands, and St. Vincent and the Grenadines.[17]  They also showed that he had an interest in at least two trusts that generated substantial interest and dividend income, and held numerous overseas bank accounts that collectively contained approximately $2,800,000.  The jury reasonably could infer from this evidence that David was a wealthy man who would not be financially devastated by a sizeable punitive damages award.  To the extent that the tax returns did not contain the most current information, there is no explanation in the record for David's failure to produce the requested 2018 tax returns, which should have been filed around April 15, 2019, the first day of trial.

---

[17] The tax returns said little about the domestic corporations in which David testified he had an ownership interest and made no mention of his status as a principal shareholder of the "Leventis-David group" referred to in the SEC letter.

33

More importantly, the tax returns were not "standing alone." Jones also introduced the SEC letter, in which David pledged to personally meet the working capital needs of an operating corporation and its subsidiaries through March 31, 2019, mere weeks before trial began. Appellants contend that the letter "fails to establish any evidence of financial condition," because it does not enumerate what the working capital needs of Hologram USA Network(s) and its subsidiaries were. However, the jury reasonably could infer that multiple, functioning companies would require a substantial amount of money to remain operative for a period of two years. The letter stated that David was a principal shareholder in a company that owned Coca-Cola bottling plants; it is common knowledge that Coca-Cola is a popular beverage worldwide, and no hearsay objection was lodged against the letter.

During the liability phase of trial, the jury also witnessed David brandish his credit card, which he described as "a Black Amex from Switzerland," and tell Jones to take it and "buy whatever you want." A reasonable jury certainly could infer, both from these comments and the manner in which David made them, that David had the resources to pay a large punitive damages award, and that such an award would be necessary to deter him from engaging in wrongdoing in the future. In short, "[t]he evidence here, viewed in the light most favorable to the judgment, shows that [David] is a wealthy man, with prospects to gain more wealth in the future." (*Rufo v. Simpson, supra*, 86 Cal.App.4th at p. 625.)

Appellants argue—and the court found in its ruling on the new trial motion—that the YouTube videos in which David described himself as a "billionaire" should not have been

admitted into evidence. Because we conclude that the other evidence was sufficient to support the punitive damages award, we need not reach this argument. We likewise need not address David's contention that any deficiency in the evidence was attributable to Jones's lack of diligence in conducting discovery.

We do, however, consider appellants' contention that David was prejudiced by Jones's counsel's closing argument on punitive damages. Counsel argued that David was absent from the courtroom in violation of court order, and that his absence prevented him from refuting their suggestion that he was wealthy: "He's not coming through that door to tell you, oh, that was just a show. I'm not really a billionaire. I'm only worth 100 million or 500 million or 800 million or whatever he might say. So all we have are his own words against him. And once again, we don't have his opposition." Appellants argue that "David does not have the burden to prove his financial wherewithal or lack thereof," and that "any suggestion otherwise to the jury was an irregularity in the proceeding that warranted a new trial."

David failed to object to these remarks below, when the court could have clarified that Jones bore the burden of proof. In any event, after the party with the burden of proof on an issue "produces evidence of such weight that a determination in that party's favor would necessarily be required in the absence of contradictory evidence," the burden of producing evidence is transferred to the other party. (1 Witkin, Cal. Evidence (5th ed. 2021) Burden of Producing Evidence, § 5.) This principle applies in the context of punitive damages. (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1309-1310.) Here, the tax returns and the letter (and the credit card incident) pointed inexorably to the conclusion that David was a wealthy man. David was not

obligated to prove his financial condition, but it was his responsibility to refute or otherwise call into question Jones's evidence. Jones's counsel did not overstep her bounds by commenting on David's perceived failure to do so.

III.    *Exclusion of Social Media Posts*

        A.    *Background*

Prior to trial, Jones filed a motion in limine to exclude evidence of her "sexual conduct," including "alleged racy photographs, flirtatious behavior or sexual conduct with anyone other than Defendant Alkiviades David." The court granted the motion, and advised the parties that if defendants sought to introduce "[a]nything that approaches that and you want to be careful, let's do a 402. Let counsel know. They might not even oppose it, depending on what it is[,] okay."

At trial, Jones testified that she "now ha[s] a problem being around men, trusting men, just . . . working with men. I feel as if, you know, it could happen again." Her treating psychologist, who testified out of order, before Jones was cross-examined, testified that Jones disclosed she was struggling with "relationships with others, particularly men, such that she is constantly thinking that she will be harassed again." The treating psychologist further testified that Jones reported "anhedonia," or "the inability to experience pleasure in everyday life." She explained that anhedonia could present as "not feeling happy when you're doing pleasurable activities in your life, like spending time with friends or seeing a funny movie." On cross-examination, she also agreed that anhedonia could manifest as avoidance of activities such as traveling.

During the subsequent cross-examination of Jones, the defense sought to introduce four Instagram posts Jones made

after she left defendants' employ to impeach this testimony. The first, dated January 11, 2018, was a photo of Jones standing with musician and then-alleged and now convicted sexual abuser R. Kelly. It was captioned, "Bringing in a King birthday last night!! Robert, what a wonderful guy!!!" Jones tagged R. Kelly and included a series of emojis, including two birthday cakes, a present, a smiley face with heart eyes, a red heart, and a lip print. The other posts, dated October 19, October 31, and November 5, 2018, were photos of Jones taken in Cabo San Lucas, Mexico. She was wearing a bikini in two of the photos and a low cut top in the third. The November 5, 2018 post was captioned, "Life is a blessing! How I am thankful for everyday! [lip print emoji]"

At sidebar, defense counsel asserted that they did not want to introduce the posts to "show anything sexual, sexual history." Instead, they asserted, they wanted to use them to impeach Jones's and her psychologist's testimony that Jones feared men and was "unable to feel joy." The court ruled that the defense could "still ask about her vacation if it's appropriate but not show the pictures." The court excluded the R. Kelly photo under Evidence Code section 352. The court permitted the defense to introduce a similar Instagram post of a photo showing Jones with boxer Floyd Mayweather.

The defense cross-examined Jones about the numerous vacations she took while on disability leave. It also asked Jones about a Maserati she purchased, and introduced an Instagram post showing the Maserati. The defense further cross-examined Jones about the Mayweather photo and other Instagram posts, including one captioned, "It's my year!!"

37

B.    *Analysis*

Appellants contend the court abused its discretion by excluding the social media posts depicting Jones standing with R. Kelly and vacationing in Cabo San Lucas.  They argue that the R. Kelly photo was "particularly valuable for impeachment purposes," in light of "the widespread knowledge of allegations against R. Kelly for sexual abuse over two decades."  They contend the court erred in excluding the Cabo San Lucas photos because they do "not present an instance of sexual conduct as contemplated by Evidence Code Section 1106(a), but rather go[ ] to impeachment of testimony."  We disagree.

We review the trial court's decision to exclude evidence for abuse of discretion.  (*Uspenskaya v. Meline* (2015) 241 Cal.App.4th 996, 1000.)  "We will not disturb a trial court's exercise of discretion "'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*Ibid.*)  "'A decision will not be reversed merely because reasonable people might disagree.' [Citation.]" (*Id.* at p. 1001.)

The court excluded the R. Kelly photo pursuant to Evidence Code section 352, which gives the trial court discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)  The court's determination that the probative value of the photo was substantially outweighed by the danger of undue prejudice or confusion of the issues was not an abuse of discretion.  This is particularly true where the court permitted

the defense to introduce and question Jones about a very similar photo of her and Floyd Mayweather.

We likewise find no abuse of discretion in the court's exclusion of the Cabo San Lucas photos. Evidence Code section 1106 provides that, "[i]n any civil action alleging conduct which constitutes sexual harassment, sexual assault, or sexual battery, opinion evidence, reputation evidence, and evidence of specific instances of the plaintiff's sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the plaintiff or the absence of injury to the plaintiff, unless the injury alleged by the plaintiff is in the nature of loss of consortium." (Evid. Code, § 1106, subd. (a).) "The term 'sexual conduct' within the meaning of section 1106 has been broadly construed to include 'all active or passive behavior (whether statements or actions) that either directly or through reasonable inference establishes a plaintiff's willingness to engage in sexual activity,' including 'racy banter, sexual horseplay, and statements concerning prior, proposed, or planned sexual exploits.' [Citation.]" (*Meeks v. Autozone, Inc.* (2018) 24 Cal.App.5th 855, 874.) The court reasonably concluded that the photos, each of which depicted Jones wearing what her response brief terms "sexy, revealing bathing suits," met this expansive definition of "sexual conduct." As defendants specifically sought to use the photos to demonstrate the "absence of injury" to Jones, the court did not err in excluding the photos.

Even if it did, appellants have not shown that they suffered prejudice from the error. (See *Jameson v. Desta*, *supra*, 5 Cal.5th at pp. 608-609; Code Civ. Proc., § 475.) Aside from a single sentence in which they assert that the evidentiary rulings denied them a fair trial, appellants make no attempt to carry their

burden of showing prejudice. "A verdict . . . shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes on the effect of the error . . . is of the opinion that the error . . . resulted in a miscarriage of justice." (Evid. Code, § 354.) We are not of such opinion. The court permitted appellants to achieve their stated aim of impeachment by cross-examining Jones about the material substance of the Cabo San Lucas photos. The exclusion of the photos themselves was not prejudicial.

IV.    *Motion for New Trial*

    A.    *Background*

As summarized in detail above, the trial court conditionally granted appellants' motion for new trial only as to economic damages. The trial court rejected appellants' contentions that there was insufficient evidence to support the punitive damages award, juror confusion led to an excessive verdict, and juror confusion led to inconsistent verdicts. Appellants now contend these rulings were erroneous.

    B.    *Governing Principles*

Code of Civil Procedure section 657 provides that a motion for new trial may be granted for a list of enumerated causes "materially affecting the substantial rights of such party." As relevant here, those causes include "[i]rregularity in the proceedings of the court, jury or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial"; "[m]isconduct of the jury"; "[e]xcessive or inadequate damages"; "[i]nsufficiency of the evidence to justify the verdict or other decision, or the verdict or other decision is against law"; and "[e]rror in law, occurring at the trial and

40

excepted to by the party making the application." (*Ibid.*) A court may grant a new trial due to insufficiency of the evidence or excessive or inadequate damages only if it "is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (*Ibid.*)

"[W]e review an order denying a new trial motion under the abuse of discretion standard. However, in doing so, we must review the entire record to determine independently whether there were grounds for granting the motion." (*Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 733.) "We will not disturb the trial court's ruling on a motion for new trial unless the record reveals a manifest and unmistakable abuse of discretion." (*Soto*, *supra*, 239 Cal.App.4th at p. 200.)

C.  *Analysis*

Appellants first contend that the court abused its discretion by "denying most of the new trial motion where trial included a dismissed cause of action," referring to the gender violence claim. They acknowledge that they failed to raise this point in their motion for new trial, but assert the court erred by denying their request to file a supplemental brief on the issue "as soon as it was discovered and by ruling that the issue of the operative complaint had been waived." Appellants argue that the court "should have ordered a new trial without the unpleaded, dismissed cause of action before the court" and "committed prejudicial error" by failing to do so. We reject these contentions for the same reasons we rejected their arguments concerning the FAC and gender violence claim.

Appellants next contend that the court should have granted the motion for new trial on the ground that "juror confusion led to

41

an excessive verdict." They argue that the jury reduced the damages for past noneconomic loss from $3,000,000 to $1,500,000 after the court clarified that punitive damages were not included in the first phase of trial, but then inconsistently awarded punitive damages in the amount of $8,000,000 after the second phase of trial. In appellants' view, "[t]he punitive damages award of $8,000,000 cannot be reconciled with the jury's initial contemplated punitive damages award of $1,500,000, especially considering [Jones] presented no competent evidence of Defendant/Appellant David's wealth in Phase II of trial." The trial court rejected this argument, finding that the jury was instructed to redeliberate, corrected its verdict after doing so, and awarded punitive damages only after hearing and deliberating on the evidence presented at the second phase of trial. The trial court also rejected appellants' related suggestion that the $8,000,000 punitive damage award "reflect[s] passion or prejudice on the jury's part."

The trial court did not abuse its discretion. Appellants reserved the right to object but did not actually object to the court's instruction to the jury to redeliberate after the court advised that punitive damages should not have been awarded during the first phase of trial. The court gave the jury the opportunity to reevaluate the entirety of its special verdict, and the only change the jury made was to the noneconomic damages award. This procedure reasonably ensured that the compensatory, noneconomic damages were not duplicative of the punitive damages, which were awarded only after the jury received and deliberated on evidence regarding David's financial condition, including his tax returns and the SEC letter. As discussed above, this evidence was sufficient to support the

42

punitive damages award. The jury reasonably could have concluded from this additional evidence that a higher punitive damages award was necessary to deter and punish David for his behavior.

Appellants also suggest that the jury "did not base its decision on the reprehensibility of Defendant/Appellant David's conduct," because it found, in connection with the assault and battery causes of action, that David did not "act, intending to cause a harmful or an offensive contact with Chasity Jones or intending to place her in fear of a harmful or an offensive contact" and did not "touch Chasity Jones with the intent to harm or offend her." In making this argument, appellants ignore the jury's findings that David committed "a physical intrusion or a physical invasion of a sexual nature under coercive conditions on the plaintiff's person," "intend[ed] to cause a harmful or offensive contact with an intimate part of Chasity Jones or . . . cause[d] an imminent fear of a harmful or offensive contact with an intimate part of Chasity Jones," and "engage[d] in the conduct with malice, oppression, or fraud." These findings clearly support the trial court's conclusion that the jury properly based its decision to award punitive damages in the amount of $8,000,000 on the reprehensibility of David's conduct.

Finally, appellants contend that the court should have granted a new trial because the jury rendered inconsistent verdicts when it found that David committed sexual battery and gender violence but did not commit ordinary battery or assault. Though they argued in their new trial motion that the verdicts "can only be explained by juror confusion," they now assert, relying only on a superseded opinion, that "[a] sexual battery is, by definition, a form of battery," such that the latter cannot exist

43

without the former. (*People v. Morales* (1985) 184 Cal.App.3d 329, *review granted and opinion superseded by* 713 P.2d 248.)[18] After observing that "[n]either party has cited persuasive authority on this issue," the trial court concluded the jury's findings that David "commit[ed] a physical intrusion or a physical invasion of a sexual nature under coercive conditions on the plaintiff's person" (gender violence) and "intend[ed] to cause a harmful or offensive contact with an intimate part of Chasity Jones or. . . caused an imminent fear of a harmful or offensive contact with an intimate part of Chasity Jones" (sexual battery) were not inconsistent with its findings that he did not "act, intending to cause a harmful or offensive contact with Chasity Jones or intending to place her in fear of a harmful or an offensive contact" (assault) or "touch Chasity Jones with the intent to harm or offend her" (battery). The trial court reasoned that it was possible to reconcile these findings by concluding that the jury "consider[ed] the lesser assault and battery claims superfluous given their findings on the more serious allegations." The court also noted that appellants did not "seriously contest" the validity of the more serious findings.

A special verdict is inconsistent if it is not possible to reconcile the jury's findings with one another. (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1316; see also *Singh v.*

---

[18] The entirety of the sentence defendants quote states, "A sexual battery is, by definition, a form of battery, and, under the instructions given, it is possible that the jurors concluded that since defendant was guilty of sexual battery he was also necessarily guilty of the lesser offense of simple battery, based upon identical conduct." The use of the word "possible" and reference to specific instructions suggest the court did not view simple battery as a necessarily included offense of sexual battery.

*Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357 (*Singh).*) "If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency." *(Singh, supra*, 186 Cal.App.4th at p. 357.) "If no party requests clarification or an inconsistency remains after the jury returns, the trial court must interpret the verdict in light of the jury instructions and the evidence and attempt to resolve any inconsistency." (*Id.* at p. 358.) "With a special verdict, unlike a general verdict or a general verdict with special findings, a reviewing court will not infer findings to support the verdict." (*Ibid.*) "The proper remedy for an inconsistent special verdict is a new trial." (*Ibid.*)

Here, no party requested clarification of the jury's verdicts. The court was thus left to interpret the verdicts in light of the jury instructions and the evidence. Its conclusion that the jury considered the lesser claims superfluous was reasonable in light of the ample evidence of sexually motivated touching presented at trial and lack of appropriately supported argument by the parties. On the record before us, we cannot conclude that the court abused its discretion in denying a new trial due to inconsistent verdicts.

## DISPOSITION

FilmOn.TV, Inc.'s appeal is dismissed. The judgment is affirmed in full. Jones is awarded her costs of appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

MANELLA, P. J.

WILLHITE, J.